Argued and submitted March 3, affirmed April 21, reconsideration denied June 9, petition for review allowed July 27, 1993 (317 Or 271)

## CITY OF KLAMATH FALLS,
*Petitioner,*

*v.*

## ENVIRONMENTAL QUALITY COMMISSION,
Northwest Environmental Defense Center,
Save Our Klamath River,
Oregon Natural Resources Council,
Oregon Rivers Council, Oregon Trout
and The Sierra Club,
*Respondents.*

(CA A72620)

851 P2d 602

376

Peter Glaser, Washington D.C., argued the cause for petitioner. With him on the briefs were Doherty, Rumble & Butler, Washington, D.C. and Richard M. Glick, Shelley Larkins and Davis Wright Tremaine, Portland.

Karl Anuta, Portland, argued the cause for respondents NEDC, Save Our Klamath River, Oregon Natural Resources Council, Oregon Rivers Council, Oregon Trout and The Sierra Club. With him on the brief was Jolles, Sokol & Bernstein, Portland.

John T. Bagg, Assistant Attorney General, Salem, argued the cause for respondent Environmental Quality Commission. With him on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Richardson, Chief Judge, and Rossman and Riggs, Judges.

RIGGS, J.

Rossman, J., dissenting.

**RIGGS, J.**

The City of Klamath Falls (the city) seeks review of the Environmental Quality Commission's (EQC) contested case order denying the city's request for certification of the proposed Salt Caves hydroelectric project for compliance with applicable water quality standards. The director of the Department of Environmental Quality (DEQ) denied the city's request, ORS 468B.040, and the city sought EQC's review. *See* ORS 468.035; ORS 468.070. The state agency certification procedure that is involved here is required by section 401 of the Federal Water Pollution Control Act. 33 USC § 1341.

■    In its first assignment, the city asserts that EQC and DEQ waived the certification requirement. Section 401 provides that a failure or refusal by the state certifying agency to act on a certification request within one year after its receipt results in a waiver. Although the director's decision was made well within the one-year period, EQC did not issue its final order within that period.

ORS 468B.040 provides:

"The Director of [DEQ] shall approve or deny certification of any federally licensed or permitted activity related to hydroelectric power development, under section 401 * * *."

That clear statute notwithstanding, the city argues that the director's decision is not the relevant one. It maintains that certification is subject to and must be determined in a contested case proceeding, which was and could only be held before EQC. Therefore, according to the city, the date of EQC's contested case order is determinative of whether the denial of certification occurred within one year.

■    Even assuming the correctness of its other premises, the city's argument confuses a procedural mechanism that state law provides with the requirement of section 401 that action on a request take place within one year. The director is specifically assigned the responsibility for acting on certification requests, and he did so here in a timely manner. Had the city not invoked its right to a contested case proceeding, the director's decision would have been final. Although the city had every right to pursue a review, we do not construe section 401 as contemplating that an applicant may benefit from the

running of the one year period while review is taking place, at the applicant's instance, of the denial of certification by the entity that is statutorily designated to make that decision. We reject the city's first assignment.

■ In its second assignment, the city argues that EQC erred in its conclusion that the increase in water temperature that the project would cause on part of the Klamath River at some times of the year is a *per se* violation of OAR 340-41-965(2)(b)(A). That rule provides, as material, in connection with waste discharges and other activities conducted in the trout producing waters of the Klamath Basin, that

> "[n]o measurable [temperature] increases shall be allowed outside of the assigned mixing zone, as measured relative to a control point immediately upstream from a discharge when stream temperatures are 58°F. or greater; or more than 0.5°F. increase due to a single source discharge when receiving water temperatures are 57.5°F. or less * * *."

The city agrees that the project would result in an increase in water temperature in an amount exceeding the *numerical* limits specified in the rule. However, it contends that, given EQC's express finding that the project "would not be adverse to the trout or the fishery" and given that the rule's purpose is to protect trout, the rule should not be "mechanically" applied to prevent certification of the proposed project. EQC disagreed, stating:

> "Contrary to the City's argument, it is the EQC's opinion that the Temperature standard is absolute as a matter of law. That is, the standard is violated by an increase exceeding the prescribed numeric criterion; no additional showing of adverse impact to a beneficial use is required."

■ According to the city, EQC's interpretation, that the temperature specifications in the rule are absolute even when the harm to be prevented by the rule does not exist, creates an "absurd result." Even assuming that we would have authority to reject the agency's interpretation of the rule if it were absurd, it is not. Whatever their purposes may be, administrative rules may be written broadly to cover many situations of varying kinds that pose a generic threat to the objects of their protection. Subject only to constitutional and statutory limitations, such rules may—and perhaps must—be applied in all circumstances to which they are expressly applicable,

without a specific showing that the factors motivating their promulgation are present in every particular case to which they literally apply. *See* ORS 183.310(8). In this case, EQC's finding that the project would not be detrimental to trout was made in conjunction with its determination that the project would not violate the anti-degradation standards under rules other than OAR 340-41-965(2)(b)(A). The violation of the temperature standards under that rule was an independent ground for denying certification, and we find no error in EQC's understanding that the rule means what it says about permissible temperature variations or that what it says is applicable to the temperature variations involved here.

■        However, the city also argues that EQC did not consider *everything* that the rule says. In addition to its temperature specifications, the rule also defines *where* in the waterway the temperature requirements apply, *i.e.*, "outside of the assigned mixing zone, as measured relative to a control point immediately upstream from a discharge." The city asserts:

> "Nothing in the decision even attempts to define the Project 'discharge,' its 'mixing zone' or a 'control point immediately upstream,' or to state how the Project will 'increase' temperature under those terms. Instead, [EQC] simply ignores the literal language of the regulation that it purports to be implementing in an 'absolute' fashion.
>
> "The reason for [EQC's] silence on these terms is that, as readily conceded by DEQ staff on cross-examination, hydroelectric projects do not have 'discharges,' 'mixing zones' or 'control points.' The use of these terms in the temperature standard reflects the fact that, as DEQ admits, the standard was written for point source discharges, where waste-water is discharged into a river from, for instance, a factory pipe, creating an artificial heating of river water."

The city concludes that the rule cannot be applied, at least literally, to projects of the kind in question.

In our view, that argument proves too much. The locational proviso in the rule is that the temperature requirements apply to all waters in the regulated area that are *outside* assigned mixing zones; if there is no mixing zone for the project, then the affected waters are necessarily not in an assigned mixing zone. If the city's point is that the rule was

meant to apply only to discharges of a specific kind, that understanding is belied by the fact that OAR 340-41-965(2) provides that, within the regulated limits, "[n]o wastes shall be discharged *and no activities shall be conducted.*" (Emphasis supplied.) The locational language in the rule may not be a model of clarity. However, EQC's interpretation of it is reasonable and is entitled to considerable weight in our review. *See, e.g., 1000 Friends of Oregon v. LCDC (Lane Co.),* 305 Or 384, 389-92, 752 P2d 271 (1988). We decline to disturb it. The remaining points that the city advances under this assignment require no separate discussion.

■ The city contends in its third assignment that EQC erred by not requiring one of its members to recuse herself for bias. It maintains that, as a former attorney with the Oregon Department of Justice, the commissioner had participated in an advocacy or advisory role in a number of matters concerning water quality generally and the siting of hydroelectric facilities, including the Salt Caves project, specifically. In response to the city's recusal motion, the commissioner stated on the record that her "prior legal work did not involve factual questions dealing with water quality, did not involve legal questions dealing directly with water quality matters, and did not involve legal issues dealing with the certification process that is before the EQC at this time." She stated further that "she had no exposure to facts * * * that could bear on the water quality issues before the Commission." The city has not refuted those assertions, and it has not made the showing necessary to obtain a reversal on this ground. *See Davidson v. Oregon Government Ethics Comm.,* 300 Or 415, 429, 712 P2d 87 (1985).

Affirmed.

**ROSSMAN, J.,** dissenting.

Those who would hail this case as a victory for the environment are sadly mistaken. In fact, its net effect is to prevent the city from implementing a project that would *correct* the current, degraded condition of the Klamath River.

The majority opinion provides only a few of the relevant facts. I will provide the rest of them. This case began when the city submitted to the Federal Energy Regulatory

Commission (FERC) an application for a license for a hydro-electric project that included a low dam and a small reservoir. DEQ issued a Section 401 certification for the project, and FERC issued an Environmental Impact Statement (EIS). The EIS concluded that an alternative plan, which it termed the "No-Dam Alternative," was a more environmentally sound approach to the project. That alternative required neither the construction of a dam nor the creation of a reservoir. Instead, it would intercept water discharged from an *existing upstream hydro-electric facility* (the Boyle project) before the water reentered the river. The water would be transported through tunnels to a new powerhouse and then returned to the river. The EIS recommended that FERC license the "No-Dam Alternative." DEQ decided that new Section 401 certification was required for the alternative plan, so the city applied to DEQ for that certification. DEQ denied the application on the sole ground that the alternative project would violate the temperature standards contained in OAR 340-41-965(2)(b)(A).

The parties agree that the alternative project, which is also known as the Salt Caves powerhouse, will affect the river's temperature. They disagree over whether the impact results in a violation of the temperature standards contained in the administrative rule. To my mind, the following facts give clear direction as to which party is correct.

The existing Boyle dam and powerhouse operate in a "peaking" mode. As a result, there are *dramatic* fluctuations in the flow of water downstream of the powerhouse. The fluctuations are bad for the river and its inhabitants. The Salt Caves powerhouse would virtually eliminate those fluctuations and would maintain the river at a flow level of 350-400 cubic feet per second—a level that is understood to be the most desirable for the native trout population. Elimination of the fluctuating flow would affect current temperature patterns, which are tied to the flow fluctuations. The Salt Caves project would not increase water temperatures by discharging heated water into the river. Rather, the "increases" would be the result of *leveling* the dramatic and unnatural fluctuations in water flow that occur because of the Boyle powerhouse. The water would not get as cold in the winter and would not get as hot in the summer. As a result, the post-

project water temperatures would be more than .5 degrees higher in the winter than they are now. The reduction of the current downward fluctuation in the winter water temperature is the basis of EQC's determination that the project violates the temperature standard and cannot be certified.

In sum, the Salt Caves project would eliminate the dramatic fluctuations in water flows and temperatures and would help return the river to its more natural condition. The EIS said that the project would be a benefit to the river. EQC specifically found that the project would not be adverse to the fish. Nonetheless, by strictly applying the terms of OAR 340-41-965(2)(b)(A), which disallows temperature increases of greater than .5 degrees, EQC concluded that the project was not in compliance with that rule and denied certification. As a result, the city now finds itself with an original dam project that was certified, and a more environmentally beneficial no-dam project that has been denied certification because it ameliorates the current, detrimental conditions on the Klamath River. The main reason why the no-dam alternative is preferred has been transformed into the sole reason why EQC is denying certification.

EQC seems to have been overly impressed by the fact that the administrative rule contains numbers. It opined that "the temperature standard is absolute as a matter of law. That is, the standard is violated by an increase exceeding the prescribed numeric criterion; no *additional* showing of adverse impact * * * is required." (Emphasis supplied.) By deciding that the rule establishes "absolute" numeric criteria, the agency was able to find a technical violation. Yet its own opinion, which rests on the assumption that violations of water quality standards have an "adverse impact," fails to acknowledge that, in this case, *there is no adverse impact at all.* Here, the temperature "variation" (which, it must be remembered, would actually return the river to its more *natural* state) exceeds the number specified in the regulation, but actually *improves* the condition of the river.

The law—and that includes the Oregon Administrative Rules—does not exist in a vacuum. It has meaning only when it is applied to *facts*. Here, a hyper-technical, bureaucratic application of the administrative rule nets a result that is the *opposite* of that which was intended by the rule: the

protection of fish. It is obvious that when OAR 340-41-965 (2)(b)(A) was promulgated, no one was thinking about how a project might *improve* a degraded river by leveling its fluctuating flows and temperatures.

The facts in this case cry out for a wise and just application of the *spirit* of the rule. This is not a novel concept. It has long been understood that

> "a thing may be within the letter of the statute and yet not within the statute, because [it is] not within its spirit, nor within the intention of its makers. * * * [F]requently words of general meaning are used in a statute, words broad enough to include [the] act in question, and yet a consideration of * * * the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act." *Holy Trinity Church v. United States*, 143 US 457, 459, 12 S Ct 511, 36 L Ed 226 (1892).

Nothing compelled EQC to interpret its regulation to reach an absurd result, and nothing compels this court to affirm that result.

Accordingly, I dissent.