Argued and submitted November 4, 1993, resubmitted April 6, decision of the Court of Appeals affirmed and order of the Environmental Quality Commission affirmed April 7, 1994

## CITY OF KLAMATH FALLS,
*Petitioner on Review,*

*v.*

## ENVIRONMENTAL QUALITY COMMISSION,
Northwest Environmental Defense Center,
Save Our Klamath River,
Oregon Natural Resources Council,
Oregon Rivers Council,
Oregon Trout and The Sierra Club,
*Respondents on Review.*

(CA A72620; SC S40270)

870 P2d 825

Peter Glaser, of Doherty, Rumble & Butler, P.A., Washington, D.C., argued the cause and filed the petition for petitioner on review. With him on the petition were Richard M. Glick and Timothy R. Volpert, of Glick, Volpert and Tremaine, Portland.

John T. Bagg, Assistant Attorney General, Salem, argued the cause and filed a response for respondents on review Environmental Quality Commission. With him on the response were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Karl G. Anuta, of Jolles, Sokol & Bernstein, Portland, argued the cause and filed a response for respondents on review Northwest Environmental Defense Center, Save Our Klamath River, Oregon Natural Resources Council, Oregon Rivers Counsel, Oregon Trout, and The Sierra Club.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Unis, and Graber, Justices.

FADELEY, J.

## FADELEY, J.

This proceeding arises from an Environmental Quality Commission (EQC) contested case order denying certification to the City of Klamath Falls' proposed Salt Cave hydroelectric project. The EQC denied certification on the basis of a regulation that limits development-caused changes in the temperature of river water. On judicial review, the Court of Appeals affirmed, and we allowed review of that decision. At issue is whether the EQC's interpretation and application of OAR 340-41-965(2)(b)(A),[1] a regulation or standard prohibiting water temperature changes caused by development, is in error. For the reasons that follow, we affirm.

## FACTS

In July 1986, the City submitted an application to the Federal Energy Regulatory Commission (FERC) for a license for a hydroelectric project to be located on the Upper Klamath River. The application proposed the building of a dam and a reservoir. Section 401 of the Federal Clean Water Act, 33 USC § 1341, requires the state to "certify" the project as a prerequisite to federal licensing. In August 1987, the Department of Environmental Quality (DEQ) declined to

---

[1] That rule provides, in part:

"Klamath Basin Beneficial Water Uses to be Protected

"340-41-965 * * *

"(2) No wastes shall be discharged and *no activities shall be conducted which* either alone or *in combination with other* wastes or *activities* will cause violation of the following standards in the waters of the Klamath Basin:

"* * * * *

"(b) Temperature:

"(A) Salmonid fish (trout) producing waters: No measurable increases shall be allowed outside of the assigned mixing zone, as measured relative to a control point immediately upstream from a discharge when stream temperatures are 58°F. or greater; or more than 0.5°F. increase due to a single-source discharge when receiving water temperatures are 57.5°F. or less; or more than 2°F. increase due to all sources combined when stream water temperatures are 56°F. or less, except for specifically limited duration activities which may be authorized by DEQ under such conditions as DEQ and the Department of Fish and Wildlife may prescribe and which are necessary to accommodate legitimate uses or activities where temperatures in excess of this standard are unavoidable and all practical preventive techniques have been applied to minimize temperature rises. The Director shall hold a public hearing when a request for an exception to the temperature standard for a planned activity or discharge will in all probability adversely affect the beneficial uses[.]" (Emphasis added.)

certify the project. The City then reapplied for certification. Acting on the second application for certification, DEQ certified the project in July of 1988, but did so subject to 13 conditions related to that proposal. As will appear more fully later in this opinion, the City has altered the nature of its request before DEQ so that, strictly speaking, a new dam and reservoir, as such, are no longer involved in the project. State certification before federal licensing is still required, however.

In July 1990, FERC issued an Environmental Impact Statement (EIS) for the project that the City seeks to have certified by the state agency. The EIS concluded that an alternative proposal for hydroelectric generation was environmentally preferred. That alternative proposal would not require the construction of a dam or a reservoir, which each previous version of the project had envisioned. Instead, a concrete wall and diversion pool would be constructed to intercept and divert river water at the point of its discharge from the tailrace of an existing hydroelectric facility, the J.C. Boyle project. The diverted river water would then be channeled via a conduit and tunnel, running along the river canyon, to a new powerhouse 10 miles down stream. The water would go through a forebay, penstock, and generating turbine there and then be returned to the river. The FERC's EIS recommended that FERC license this "No-Dam" alternative.

On June 5, 1990, the City applied to DEQ to certify the alternative proposal involving diversion of the water from the river. In a letter dated February 7, 1991, the Director of DEQ denied certification on the grounds that the alternative plan "would not comply with the water quality standard for temperature [OAR 340-41-965(2)(b)] during the winter months," nor "with the narrative standard for Fungi and other growths [OAR 340-41-965(2)(h)]," and "would violate the anti-degradation standard to the detriment of designated beneficial uses [OAR 340-41-026(1), 340-41-962, 340-41-965(1)]." (Brackets in original.) Pursuant to OAR 340-48-035, the City requested a contested case hearing before the EQC to contest the Director's denial.[2]

---

[2] The EQC is a policy-making body with authority over the DEQ. ORS 468.015; ORS 468.030.

During the contested case, DEQ withdrew the portion of the Director's determination that found that the proposed project would violate the fungi standard, OAR 340-41-965(2)(h). On October 21, 1991, EQC concluded, contrary to the earlier ruling of DEQ Director, that the project "would not violate the Anti-Degradation standard, as set forth in OAR 340-41-026(1), 340-41-962, and 340-41-965(1), because water quality changes caused by the project would not adversely affect a designated beneficial use on the Klamath River." However, EQC also concluded, as had the DEQ Director, that the project "would violate the Temperature standard, as set forth in OAR 340-41-962(2)(b)(A) [sic], because the project would increase water temperatures by more than 0.5°F when receiving waters are 57.5°F or less." Accordingly, EQC affirmed the Director's decision to deny certification.[3]

The City petitioned to the Court of Appeals for judicial review. The City made three assignments of error. One alleged that "EQC erred by denying certification for the Project based on EQC's holding that the temperature standard is 'absolute as a matter of law.' "[4] The Court of Appeals,

---

[3] EQC's findings of ultimate fact and conclusions of law in part are:

"*Ultimate Findings of Fact*

"1. On balance, the impacts of the Salt Caves project's water quality changes on trout would not be adverse to the trout or the fishery.

"2. The Salt Caves project would at times result in an increase in the Klamath River's water temperature of greater than 0.5°F when existing water temperatures are 57.5°F or less.

"*Conclusions of Law*

"* * * * *

"2. The Salt Caves project would not violate the Anti-Degradation standard, as set forth in OAR 340-41-026(1), 340-41-962, and 340-41-965(1), because water quality changes caused by the project would not adversely affect a designated beneficial use on the Klamath River.

"3. The Salt Caves project would violate the Temperature standard, as set forth in OAR 340-41-962(2)(b)(A) [sic], because the project would increase water temperatures by more than 0.5°F when receiving waters are 57.5°F or less.

"4. The violation of any water quality standard by a proposed activity requires denial of water quality certification under the federal Clean Water Act, 33 USC § 1341, and under state law, ORS 468.732 [now numbered as 468B.040]. The decision of the DEQ Director denying certification was correct as a matter of law."

[4] The other two assignments of error are that "DEQ and EQC erred by not issuing a final order based on contested case proceedings until October 21, 1991,

with one judge dissenting, affirmed the order on all assignments of error. *City of Klamath Falls v. Environ. Quality Comm.*, 119 Or App 375, 851 P2d 602 (1993). The City then petitioned this court for review. We allowed the City's petition, but limited our review to the claim of error related to the water temperature standard issue.

## ANALYSIS

ORS 183.482(8)(a) authorizes the Court of Appeals and this court to review an agency order in a contested case for erroneous applications or interpretations of law. ORS 183.482(8)(a) provides:

"The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law."

Here, we are asked to review an agency's application of its own regulation to the City's proposed hydroelectric project. In the instant case, EQC found that, "[t]he Salt Caves project would at times result in an increase in the Klamath River's water temperature of greater than 0.5°F when existing water temperatures are 57.5°F or less."[5] EQC then concluded as a matter of law that "[t]he Salt Caves project would violate the Temperature standard as set forth in OAR 340-41-962(2)(b)(A) [*sic*]," even though EQC also found as fact that, "[o]n balance, the impacts of the Salt

_____

more than one year after the filing of the City's application for certification," and that EQC erred in deciding that one of the commissioners need not recuse herself from the contested case.

[5] According to the EQC's findings of fact, this Salt Caves project diversion would reduce flows in the Klamath River Canyon through the Salt Caves diversion reach of the river to 350 to 400 cubic feet per second. Of this amount, 100 cubic feet would come from water originating above the Boyle project dam and 250 to 300 cubic feet would come from springs in the Boyle diversion reach. The present flows in the Salt Caves diversion reach, when the J. C. Boyle project is operating and there is no Salt Caves project diversion, are in the 1,650 cubic feet per second range in summer and in the 2,800 cubic feet per second range in winter.

Caves project's water quality changes on trout would not be adverse to the trout or the fishery."[6]

The City contends that the EQC erred as a matter of law when it denied the City certification based on the temperature standard regulation. The City asserts three arguments in support of that claim. All three concern the EQC's interpretation of its temperature standard regulation to be mandatorily applicable to the City's project.

The City's first argument is that the EQC misinterpreted its own temperature-standard regulation, because the proper interpretation would require an affirmative determination in each specific case that fish will be harmed in fact by temperature changes before the temperature regulation may be applied to any specific project. The second argument claims that the regulation grants the EQC discretion whether to invoke or not invoke its water temperature regulation in relation to any given project, such as the City's proposed project. The City's third argument is that the EQC's order fails to spell out *how* that agency interpreted terms of the temperature standard regulation to apply to the City's hydroelectric project, and that a remand to EQC is therefore necessary.

Consideration of those arguments requires an understanding of the statutes that assign responsibilities to the agency involved. We turn to a review of the statutes defining the EQC's responsibilities relevant to this case.

ORS 468B.048(1) authorizes EQC to make rules to "establish standards of quality and purity for the waters of the state in accordance with the public policy set forth in ORS 468B.015." ORS 468B.015 provides, in part, that it is the "public policy of the state * * * [t]o protect, maintain and improve the quality of the waters of the state * * * for the propagation of * * * fish and aquatic life * * * and other legitimate beneficial uses[.]" ORS 468B.015(2). EQC has provided by rule that "Salmonid Fish Rearing" and "Spawning" are among the protected beneficial uses of the specific

---

[6] Although the City's argument relates this finding to the temperature standard, EQC appears to have made the latter finding for the purpose of considering whether to apply the anti-degradation standards, OAR 340-41-026(1)(a), also at issue at the agency's contested-case proceeding in this matter.

waters where the City's proposed project is to be located. OAR 340-41-962 Table 19. "Hydro Power" is *not* one of the beneficial uses designated by the EQC for those particular waters. *Id.*[7]

■     Section 401 of the Federal Water Pollution Control Act (Clean Water Act) provides in part:

> "Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate[.]" 33 USC § 1341(a)(1).[8]

Indeed, states are required by the Act to adopt water quality standards. *Id.* § 1313.

■     The Oregon legislature generally has assigned the state's responsibility to implement the federal Act to the EQC. ORS 468B.352. Under the federal Act,

> "Such * * * water quality standard shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses. Such standards shall be such as to protect the public health or welfare, enhance the quality of water and serve the purposes of this [Act]. Such standards shall be established taking into consideration their use and value for * * * propagation of fish * * *." 33 USC § 1313(c)(2).

That Act also requires that states submit their standards to the Environmental Protection Agency (EPA) so that EPA may review the standards for compliance with the Act. *Id.* § 1313(a)-(c). EPA may either approve the standards or notify the state of changes required to bring the standards into

---

[7] OAR 340-41-962 Table 19 indicates that EQC has designated "Hydro Power" as one of the beneficial uses of Klamath River waters only between Klamath Lake and Keno Dam. The record indicates that the City's proposed project falls outside that area.

[8] In Oregon, the legislature has delegated or assigned the state's responsibility to provide this certification to the Director of DEQ when the activity for which certification is sought relates to hydroelectric development. ORS 468B.040. The legislature also has provided that the Director of DEQ approve or deny certification, only after making findings that the approval or denial is consistent with: (among other things,) "[r]ules adopted by the Environmental Quality Commission on water quality[.]" ORS 468B.040(2)(a).

compliance with the Act. *Id*. § 1313(c)(3). Should a state fail to submit standards to EPA, or fail to make the changes required by EPA, EPA must then promulgate standards for that state. *Id*. When EPA approves a state's proposed standard, that standard "shall thereafter be the water quality standard of the state." *Id*. § 1313(c)(3). In sum, Oregon's water quality standards are mandated by state, as well as federal, law; and one of the purposes of these standards, under both state and federal law, is to protect fish.[9]

### A. *EQC's Interpretation of OAR 340-41-965(2)(b)(A) Not to Require a Separate Showing of Harm to Trout*

The City argues that EQC erred by not interpreting OAR 340-41-965(2)(b)(A) to prohibit a water temperature increase of more than 0.5°F *only when* the agency affirmatively finds in any individual instance that the temperature increase would adversely affect trout. The EQC explicitly rejected that interpretation. Instead, it opined, in its final order, that

> "the Temperature standard is absolute as a matter of law. That is, the standard is violated by an increase exceeding the prescribed numeric criterion; no additional showing of adverse impact to a beneficial use is required."

The City contends that that interpretation is in error, because it creates an absurdity when applied to the facts in this case:

> "It is undisputed that the sole purpose of that rule is to protect fish, and that the Project would not harm fish. Thus, EQC's interpretation of OAR 340-41-965(2)(b)(A) to deny certification creates a result totally opposite of the rule's purpose — a result that is absurd."

The City suggested in its brief to the Court of Appeals[10] that the project would in fact benefit trout, because it would

---

[9] Here we are not referring to an enhancement of the pre-project conditions but to protection of existing habitat.

[10] The Court of Appeals found no error in EQC's interpretation, stating:

"Whatever their purposes may be, administrative rules may be written broadly to cover many situations of varying kinds that pose a generic threat to the objects of their protection. Subject only to constitutional and statutory limitations, such rules may — and perhaps must — be applied in all circumstances to which they are expressly applicable, without a specific showing that the factors motivating their promulgation are present in every particular case to which they literally apply. *See* ORS 183.310(8)." *City of Klamath Falls v. Environ. Quality Comm.*, 119 Or App 375, 378-79, 851 P2d 602 (1993).

negate current adverse conditions on the Klamath River, artificially created by a presently operating hydroelectric project.[11]

■ ■    The legislature independently has made a policy choice, albeit one also comporting with federal law, to protect, maintain, and improve the state's water quality for, among other things, the propagation of fish and other beneficial uses. ORS 468B.015(2). To that end, the legislature has also made the further policy choice to entrust EQC with the task of developing and adopting "water quality standards." ORS 468B.048(1). EQC's rulemaking mandate is broad, subject to satisfying various factors related to water quality and purity. ORS 468B.048(1).[12] The temperature standard at issue in this case, OAR 340-41-965(2)(b)(A), is a product of that mandate, as we shall see. In addition, by making a further

---

One judge was persuaded by the City's argument *as a matter of fact* (although judicial review of an agency order is not *de novo*) and, consequently, dissented on the ground that application of the standard in that case would be contrary to the purpose of the standard, which is to protect fish. *Id.* at 382-83 (Rossman, J., dissenting).

[11] The proposed project's impact on trout was the subject of some controversy in the contested case. The City produced evidence that the project would benefit trout. However, EQC declined to adopt the City's position in its final order. Instead, it found that the project would not, "on balance," adversely affect trout. The City does not argue that this finding is not supported by substantial evidence in the record, so there is no ORS 183.482(8)(c) question presented. We recognize that it might be awkward for the City to challenge EQC's finding for lack of support in the record when it is the City's apparent position that its project provides positive benefits to trout. Nonetheless, we accept EQC's findings on issues of fact, ORS 183.482(7), when they are supported by substantial evidence in the record, ORS 183.482(8)(c). The City argues that its contention — the project would benefit trout — *supplements*, rather than "substitutes" for EQC's factual finding. But that finding of fact may not be made or inferred on review because the EQC declined to make it after weighing the evidence that was before it.

[12] Those factors include:

"* * * * *

"(f)   The limits of other physical, chemical, biological or radiological properties that may be necessary for preserving the quality and purity of the waters of the state;

"* * * * *

"(h)   The value of stability and the public's right to rely on standards as adopted for a reasonable period of time to permit institutions, municipalities, commerce, industries and others to plan, schedule, finance, and operate improvements in an orderly and practical manner." ORS 468B.048(1).

In addition, EQC's standards must be consistent with the Water Resources Commission's policies and programs. ORS 468B.048(2).

specific policy choice under its mandate to protect salmonid fish, OAR 340-41-962 Table 19, EQC also has completed and refined the legislature's policy choice to protect fish. OAR 340-41-965(2)(b)(A) reflects that refined policy choice. There is no reason to doubt EQC's construction of OAR 340-41-965-(2)(b)(A) as uniformly mandatory, *i.e.*, not to require a separate showing of harm to trout for each individual application before a violation of the standard is made out.

The words of the standard plainly do not require a showing of harm before a violation is made out. The words of the standard do not create any ambiguity in its meaning in that regard. ORS 174.010 admonishes courts, "not to insert what has been omitted" when they interpret a statute. That rule of construction applies equally to agencies when they interpret an agency's administrative rules and regulations, *see Columbia Steel Castings Co. v. City of Portland*, 314 Or 424, 430, 840 P2d 71 (1992) (principles of statutory construction apply to "discrete sets of administrative rules that deal with a particular topic") and when we review an agency's interpretation of its rule. OAR 340-41-965(2)(b)(A) should be interpreted to mean what it says: that it is a *per se* violation to cause temperature increases over its prescribed limits in situations covered by the standard. No further showing of adverse effect on trout is required before the violation is made out.

Further, ORS 468B.048(1)(f) expressly contemplates regulations that will limit "other physical * * * properties that may be necessary for preserving the quality" of Oregon's waters. Temperature is a physical property.[13] In evaluating EQC's construction of its rule, we note also that the legislature has instructed EQC to consider the following factor when establishing water quality standards:

> "The value of stability and the public's right to rely upon standards as adopted for a reasonable period of time to permit institutions, municipalities, commerce, industries and others to plan, schedule, finance, and operate improvements in an orderly and practical manner." ORS 468B.048(h).

---

[13] Federal code also includes "thermal water quality standards" within the term "water quality standards." 33 USC § 1313(h).

One way that EQC can promote that value is to choose, as a matter of policy, to establish numerically based standards that are derived from one-time factual determinations that the objects of the standards' protection will be defeated when the numbers in the standards are exceeded. We believe OAR 340-41-965(2)(b)(A) to be such a standard.

The temperature standard is a part of this state's water pollution laws. When it established and adopted OAR 341-40-965(2)(b)(A), EQC factually determined that trout are harmed by discharges that increase the receiving water's temperature by over 0.5°F, when the temperature of the receiving water is 57.5°F or less. Given that prior determination, it would be redundant, as well as contrary to the "value of stability and the public's right to rely on standards," to require a further showing of harm to trout before a violation of the standard is made out. Consequently, we believe that the temperature standard embodies a policy choice to protect trout through a *one-time* factual determination of general applicability that trout are harmed by temperature increases above the standard's limits. EQC's interpretation of the temperature-standard rule not to require a further showing of harm is fully consistent with and, indeed, dictated by this policy choice. That interpretation is also within the policy of the statutory scheme authorizing the standard, namely, to protect the state's water quality for fish propagation and other beneficial uses. It is consistent as well with other statutory standards for DEQ's regulatory rules, *e.g.*, to promote the "value of stability and the public's right to rely on standards" and to limit changes of physical properties of river water as necessary to preserve its quality.

The City's argument that applying the standard to the proposed project results in an absurdity amounts to an attack on the factual premises underlying the standard and, hence, on the validity of the standard itself. Only specific legal defects may be considered on judicial review. ORS 183.482(7), (8). EQC did not err in interpreting the temperature standard not to require a further showing of specific harm before a violation under the standard is made out.

## B. EQC's Discretion to Interpret OAR 340-41-965-(2)(b)(A) Not to Apply to the Project

The City contends that EQC believed that it was bound to apply the temperature standard to the project once it found the temperature increases over the standard's prescribed limits. The record supports that contention; the EQC's order does treat the temperature standard as mandatory "as a matter of law." The City argues that such a construction was an error of law. Specifically, the City argues that EQC erred by failing to recognize that it has the discretion to interpret the standard not to apply to the City's project when application of the standard would result, as the City contends, in an absurdity. The City argues that the absurdity exists because the purpose of the standard is to protect trout, yet EQC found that the project would not harm trout. Therefore, the City's argument continues, an interpretation that the standard applies to the project "creates a result totally opposite" to the standard's purpose.[14]

Agencies are creatures of statute. In the absence of a constitutional provision concerning their function and authority, they derive their authority from:

> "(1) the enabling legislation that mandates that particular agency's function and grants powers, and (2) from general laws affecting administrative bodies." *1000 Friends of Oregon v. LCDC (Clatsop Co.)*, 301 Or 622, 627, 724 P2d 805 (1986).

That authority may also be circumscribed by the agency's own regulations. *See id.* ("When the question is one of an agency's authority to act in a certain way, the first resort is to the legislation and rules governing that agency."). Consequently, whether agency discretionary authority exists in a

---

[14] We recognize that we have earlier addressed the City's argument that EQC's *interpretation* of OAR 340-41-965(2)(b)(A) as a *per se* rule is absurd. We held that there is no error in this interpretation and that the City cannot challenge this interpretation as absurd when applied to its project because that would be an impermissible challenge to the standard's factual premise. That earlier challenge differs from the challenge we now are considering. The earlier challenge was to an aspect of EQC's *interpretation* of the temperature standard. The challenge that we are now considering is based on EQC's alleged failure to recognize that, regardless of the regulation's meaning, the EQC has the *discretion* to apply the regulation different from what it has done. These issues are not the same. *See 1000 Friends of Oregon v. LCDC (Lane Co.)*, 305 Or 384, 388, 752 P2d 271 (1988) ("issues of 'discretion' differ from issues of 'interpretation' ").

given context depends on that agency's statutory authority and general laws governing agencies. Therefore, in reviewing an agency contested case order for the agency's possible failure to recognize that it has discretion to decline to apply a rule to a certain factual setting, we are reviewing the order for the agency's *erroneous interpretation of the law.* ORS 183.482(8)(a).[15]

■      EQC's enabling legislation instructs it to make "water quality standards" in accordance with certain legislative public policy purposes. ORS 468B.048(1). Those public purposes include to protect, maintain, and improve the state's water quality for fish propagation and other beneficial uses and to prevent new water pollution. ORS 468B.015(2), (4). From those statutes, we can conclude that the legislature has made a general policy choice to establish water quality standards to protect fish but has left it up to EQC to specify the details of the standards.[16] To that extent, EQC has discretionary authority to refine the legislature's choice to protect the state's water quality for fish and to choose the manner by which the legislative goal will be achieved.[17] In this case, the agency has exercised its discretion by refining the legislature's choice through adoption of the temperature standard rule.

The City argues that EQC has the discretion to interpret the temperature standard not to apply to the project because application of the standard to the project is contrary to the standard's purpose. In this case, however, an interpretation that the temperature standard applies to the project is not contrary to the policies embodied in the standard.

---

[15] This much was suggested by Justice Gillette, who wrote, while on the Court of Appeals:

"The range of discretion granted to an agency is a product of statute. Thus, an agency's exercise of discretion is an expression of that agency's interpretation *of the extent of its statutory authority. Seen in this way, the agency's action* involves an interpretation of law * * *." *Van Gordon v. Ore. State Bd. of Dental Examiners,* 63 Or App 561, 569, 666 P2d 276 (1983).

[16] Federal requirements for the content of state water regulations are minimums only; state standards may be stricter. 33 USC § 1370.

[17] We note that ORS 468B.005(3) defines "water pollution" to include "change in temperature" under certain circumstances and ORS 468B.020(1) declares that "[p]ollution of any of the waters of the state is * * * contrary to the public policy of the State of Oregon."

The standard aims to protect trout by enforcing a limit, based on an unchallenged factual determination, that trout may be harmed by temperature increases over the standard's prescribed limit. Enforcement of the standard, which by definition avoids the risk that the standard was created to overcome, vindicates these policies. *See* ORS 468B.040 ("[T]he director * * * shall approve or deny a certification only after making findings that the approval or denial is consistent with * * * [r]ules adopted * * * on water quality[.]").

As the City would have it, interpreting the standard to apply to the circumstances that existed in the present case results in an "absurdity." It is true that EQC found that, if the project were built, it would not, "on balance," harm trout. But, as we have explained, it is not necessarily contradictory to interpret the standard to apply to the project nonetheless, because such an interpretation merely increases the certainty that the trout in the waters where the project is to be located will not be harmed and that they will be protected.

Petitioner's arguments imply that the agency charged with protecting the fish resource and with furthering beneficial uses of the Klamath River, a public waterway, may not do more to protect the public interest in those waters than the bare minimum that could be adequate to the purpose, *i.e.*, that governmental protections of the public interest may not include a margin of error on the side of providing more protection to the fish. The City has not directed us to any source of law that so limits the agency's policy choice that it has embodied in its rules. We are not persuaded that such limits exist.

The agency's interpretation, while perhaps arguably providing more protection in certain situations to the fish than the minimum that the statutes demand, nonetheless is fully consistent with the policy purposes of the standard and, thus, is within EQC's discretionary competence.[18] The City's second argument, accordingly, fails.

---

[18] Indeed, error might arise if EQC failed to construe the rule consistent with the policy purposes of the governing statutes. *See, e.g., Clark v. Jackson County*, 313 Or 508, 514-15, 836 P2d 710 (1992) (a construction clearly contrary to enacted language or intent of construing agency's ordinance is subject to correction on judicial review).

### C.  EQC's Interpretation of OAR 340-41-965(2)(b)(A) to Apply It to the City's Proposed Project Is Not Explained in Its Order

The City's final argument is based on the wording of the rule applied by EQC. The City argues:

> "[R]ead literally, the standard bans only temperature increases in relation to 'control points,' 'mixing zones' and 'discharges.' * * * [T]hese terms apply to point source discharges and have no meaning in the specific context of the Salt Caves Project."

That argument does not directly state what is the claimed error of law by the agency to which the argued point relates. The error assigned in the Court of Appeals is that the EQC erred by holding that the temperature standard is absolute as a matter of law. In support of that assignment, the City stated an argument that the EQC order "provides no rational basis for finding that the Project violates the temperature standard." In support of that point, the city asserted that the temperature standard "cannot literally be applied to hydroelectric projects." In its petition for our review of the adverse decision of the Court of Appeals, the City explains further that it believes the temperature standard rule to be "ambiguous" and that the order of EQC does not disclose how EQC interpreted the rule to apply to the Salt Caves project, a project where it is a discharge of water out of the river — rather than a discharge into it — that changes the quality of the river waters beyond the temperature limits permitted by the standard. Under this argument, the City seeks a remand to the EQC.

■    The initial difficulty with the City's position — seeking a remand so that EQC may detail how it interpreted the rule to apply to City's hydroelectric project — is that the issue of legal applicability of the rule to hydro projects in general has not been raised heretofore by any of the City's assignments of error.[19] There is no assignment of error designed to test whether the temperature standard legally may be applied

---

[19] That issue was recognized by the parties during an earlier agency preceding related to the City's application for certification of a dam project on the Klamath River. Indeed, the record in this case discloses that, in the earlier proceeding, the City sought, unsuccessfully, a new EQC rule to provide that allowable temperature "downstream" from a hydroelectric project" shall be established on a case-by-case basis.

to the specific sort of project that discharges water out of a river rather than into it. Neither is there any assignment of error designed to test whether the scope of the contents of the EQC's order is legally sufficient to constitute a final, reviewable order in an administrative contested case.

We assume, however, that the argument about the failure of the EQC's order to disclose how it interpreted its "ambiguous" temperature rule so that the rule could provide a rational basis for denying certification is related to the City's assignment of error that the EQC erred by "holding that the temperature standard is 'absolute as a matter of law.' " The City's argument nonetheless provides no basis for reversal of the agency's action.

EQC's order discloses that the water temperature is changed by the project to a greater extent than permitted by the limits of the rule. The City agrees that such a temperature change occurs. The order also indicates that the water remaining in the river for the 10-mile reach below the diversion is the "receiving water" referred to in the rule. The EQC order discloses that the project will change the existing winter water temperature in the 10-mile length of the river between the point where the project will divert the river's water and the point where the project will return the water to the river (the "Salt Caves diversion reach"). And it discloses that the cause of the change in temperature is the diversion from the river of about 2,400 cubic feet per second of water by the City's project, leaving about 400 cubic feet per second in the river. Because there is no contest whether the temperature changes prohibited by the standard exist, and the order indicates where that change occurs, the EQC's application of the standard has a rational basis, one explained in the EQC's order, for denial of the certification requested.

## CONCLUSION

Initial interpretation of a regulation is for the administrative agency entrusted with that task by the legislature; it is not for appellate courts on judicial review. We are not able to hold, as the City argues that we should, that EQC misinterpreted its own regulation as a matter of law. The facts found by the agency are consonant with applying the temperature regulation to the City's proposed project. Because

the project would violate that regulation, EQC's denial of certification for the City's project was not an error of law.

The decision of the Court of Appeals is affirmed. The order of the Environmental Quality Commission is affirmed.