Argued and submitted March 3, affirmed May 21, 1997

Joe Owen EVANS,
*Petitioner,*

*v.*

The ATTORNEY GENERAL of the
State of Oregon,
*Respondent.*

(Agency No. 95-002; CA A93029)

939 P2d 111

Jacob Tanzer argued the cause and filed the briefs for petitioner.

Richard D. Wasserman, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

Petitioner seeks review of an order issued by the Department of Justice (DOJ) that imposed a civil sanction of $70,000 for violating bingo operation statutes and administrative rules after DOJ brought an enforcement proceeding against him. We review for errors of law and substantial evidence and affirm. ORS 464.500(3); ORS 183.482(1).

Under ORS chapter 464, DOJ is charged with the regulation of bingo games operated by charities. It adopts rules, renews licenses and permits, regulates the manner of operation of the games, investigates whether there has been a violation of applicable statutes or rules, holds contested case hearings and undertakes enforcement proceedings.[1] This case arose after DOJ undertook an enforcement proceeding against petitioner and concerns his involvement in two unrelated licensed bingo halls operated by the Blind Enterprises of Oregon (BEO) in Portland and the Boys & Girls Club of Salem (BGCS). Each hall operates daily and allocates space and time among several licensed sponsors including BEO and BGCS, who operate their own games. Each sponsor uses its own manager and employees. Petitioner entered into contracts with the sponsors from both halls. The sponsors' contracts with petitioner are similar in content.

## BEO HALL

In late 1993, all five sponsors at the BEO hall were losing money. To increase profits, BEO retained petitioner for a fee of $2,000 per month to train managers and to market the bingo games to the public. The contract provided, in part, that "[Petitioner] is being contracted to perform development work in BEO's hall" and that he was to provide services that included "[d]irect Mail Marketing, Cohesive Relationship Building and On-Call Staffing."

---

[1] The relevant statutes uniformly refer to the DOJ. The contested case hearing in this case was captioned "Before the Attorney General of the State of Oregon" and the Attorney General is named respondent on review. No party raises any issues as to the distinction and we will use the term DOJ.

Ruecker, the executive director of BEO, testified about petitioner's performance under the contract:

> "Well, he facilitated at managers meetings. Actually, even initiated managers meetings; brought the managers together to sit and talk about what their goals and objectives were; how they wanted to play their game; what they did that may impact each other negatively or positively. He did the ads; knew how to do layouts for the *Bugle*, which is the bingo newspaper; suggested strongly that we implemented a direct mail campaign and had done some statistical research on that and the effectiveness of that. He implemented that direct mail campaign. He reported to the sponsors at sponsors meetings."

Petitioner's efforts were successful. Patronage at the BEO hall grew from 160-200 persons per night to 260-300 persons per night, and the profitability of the hall changed from a monthly net revenue loss to a monthly net revenue of approximately $10,000.

In February 1994, BEO and the sponsors replaced petitioner with an advertising agency to save expenses. Thereafter, the number of patrons decreased, and the profits diminished. In November 1994, BEO and the other sponsors retained petitioner to investigate the situation and make recommendations. Subsequently, they retained him for a fee of $3,000 per month per sponsor to revamp the advertising program and to meet regularly with their managers. Ruecker testified about the sponsors' motivation in contracting with petitioner:

> "It was the opinion of the sponsored organizations that the managers did not communicate well with each other. That there was a lot of tension, a lot of bickering and not moving forward and getting the job done. Sponsors were feeling that they were spending a great deal of their time on functions that really ought to be performed by managers.

> "We felt that [petitioner's] expertise in bingo that he could facilitate those meetings and keep them on task relating to the game of bingo as well as assist them in areas of conflict resolution.

> "* * * * *

"* * *[L]ack of consistency, internal strife, infighting will destroy a hall. So, consistency is the key."

## BGCS HALL

The Boys & Girls Club Bingo (BGCB) is an organizationally distinct part of BGCS. It operates a bingo hall in Salem in which it and other sponsors operate bingo games. In May 1994, BGCB's profits had dropped off from approximately $50,000 per month to $13,000 per month because of new competition from Portland operators. BGCB contracted with petitioner to help its business. The contract provided, in part:

"Services to be performed by [petitioner] - Direct Mail Marketing Campaign, Investigation of Three Major Competitors and [BGCB] Game Development and Marketing Plan Development and Implementation, Concessions Development and Daytime Bingo Development."

BGCS paid petitioner $11,000 per month for his services.

## THE ALJ'S FINDINGS AND THE DOJ'S ORDER

The administrative law judge (ALJ) appointed by DOJ to hold a hearing on DOJ's enforcement proceeding against petitioner found that, because of his performance under the above contracts, petitioner had engaged in the unlicensed management and operation of bingo games. The ALJ characterized petitioner as "a middle management level operator of bingo gaming for the charities." In support of his characterization, the ALJ summed up petitioner's participation:

"[Petitioner's] intimidating (to some), direct and hands-on management style as 'felt' by others was demonstrated by: 1) * * * requiring floor managers to attend weekly planning/strategy meetings, [to] change their personal schedules so they could attend, * * * to reach agreement and when any person objected, [petitioner] would and did eject that person from the meeting; 2) [firing] a manager-type person who apparently was out of step with [petitioner's] agenda; 3) [taking] over the advertising of the bingo games; 4) develop[ing] and implement[ing] a marketing strategy and otherwise * * * engag[ing] in key management functions although he did not necessarily have the ultimate decision making authority. [Petitioner] was allowed to

manifest to others that he was in control or could control bingo gaming operations."

Based on these findings, the ALJ concluded that each of the agreements that the sponsors and petitioner entered into violated ORS 167.118, 464.310(2), 464.470(1)(b), and 464.470(1)(k) and that the payments petitioner received under each agreement exceeded the maximum limit on compensation that could be paid, in violation of OAR 137-25-040(5), ORS 464.470(1)(b), and 464.470(1)(k). The ALJ also concluded that, because petitioner participated in the management or operation of multiple bingo licensee operations without the authorization of the DOJ, he was in violation of ORS 464.310(2), 464.470(1)(b), and 464.470(1)(k). Accordingly, he recommended a $25,000 civil sanction.

DOJ accepted the ALJ's findings but disagreed with the ALJ's recommendation as to the sanction. Pursuant to OAR 137-25-320(1), it determined

"as a matter of policy, the Department concludes that the $25,000.00 penalty fails to adequately assure future compliance with the statutory scheme and may encourage those to ignore the scheme in the name of the public good."

Thus, DOJ ruled that, because petitioner had entered into unlawful contracts with seven different licensees, each contract was subject to a sanction up to the $10,000 limit as set forth in ORS 464.470(2). Petitioner seeks review.

THE DOJ'S AUTHORITY UNDER ORS CHAPTER 464

■ Petitioner first assigns error to the conclusion that he is in violation of ORS 167.118, ORS 464.310(2), ORS 464.470(1)(b) and ORS 464.470(1)(k) because of his contract with BEO and the other sponsors in the BEO hall for bingo-related services. Petitioner argues that the statutory scheme in ORS chapter 464 merely affords DOJ authority to impose a civil sanction against an applicant, licensee or permit holder for gaming activities and that, because petitioner is not an applicant, licensee or permit holder, it lacks the authority under those statutes to impose a sanction against him. ORS 464.470(1) provides:

"The Department of Justice may deny an application for or refuse to renew a bingo * * * license or permit, and it may suspend or revoke any license or permit, for grounds stated in this section. Grounds for denial, renewal, suspension, revocation or civil penalty include, but are not limited to, cases in which the applicant, licensee or permit holder, or any *person with an interest* in the bingo * * * operation or proposed operation of the license applicant or licensee * * *." (Emphasis supplied.)

DOJ contends that petitioner is subject to ORS chapter 464 because he is a person with an "interest" in a bingo operation. The term "interest" is not defined in the statutory scheme. Thus, we turn first to the text and context of the statutes to discern the intent of the legislature.

Petitioner suggests that the most apt definition of "interest" is found in either the Merriam-Webster's Collegiate Dictionary or Black's Law Dictionary. *Merriam-Webster's Collegiate Dictionary* 610 (10th ed 1993) provides that interest means the "right, title or legal share in something." *Black's Law Dictionary* 950 (4th ed 1968) defines interest as follows:

"More particularly, it means a right to have advantage accruing from anything; any right in the nature of property, but less than title; a partial or undivided right; a title to a share."

He concludes that under those definitions, a contractor who merely provides services or advice to a bingo operation holds no ownership interest or legal share in the bingo hall or its business. DOJ counters that when the legislature used the word "interest," it did so with the intent to encompass any interest that could affect the operation of the games. It argues that when the word "interest" is read in context with the rest of the statute, it is clear that the legislature intended the word to be broadly interpreted to include those who act as managers of bingo halls.

In particular, DOJ points to ORS 464.280(3), which provides:

"All license and permit holders and persons having any financial, *management* or employment interest in bingo * * * licenses, including but not limited to employees and

agents of such licensees, shall have a duty to inform the department or its staff of any act or omission which they believe would constitute a violation of state law or department rules relating to the operation of bingo, lotto or raffle games." (Emphasis supplied.)

ORS 464.470(1)(b) makes a violation of ORS 464.280 a ground for imposition of a civil sanction. ORS 464.470(1)(b) also makes a violation of ORS 464.310(2) a ground for a civil sanction. The latter statute prohibits a person who is not an employee or member of the organization from participating in the management of the bingo operation. Thus, in the light of the enforcement scheme enacted by the legislature, DOJ contends that the interest referred to in ORS 464.470(1) must encompass all the interests referred to in ORS 464.280 and ORS 464.310.

In the light of the above arguments, we conclude that it is unclear what the legislature intended when it used the phrase "any person with an interest" in ORS 464.470. Both petitioner's and DOJ's arguments are reasonable interpretations. Because it is not clear from the text and context of the statute what the legislature intended, we turn to the legislative history for further guidance.

The legislative history suggests that the legislature had concerns about individuals profiting from bingo operations. Tape Recording, Senate Committee on Government Operations, April 29, 1987, Tape 104, Side A at 084. The legislature desired that the only organizations that could profit from bingo games would be charitable organizations. Second, the legislature added a civil sanction to the proposed legislation to provide recourse to *the agency* to enforce the statutes when violated by persons who did not have a license issued by DOJ. *Id.* at Tape 104, Side B at 001. In particular, Senator Monroe said in a work session of the committee that he believed it was imperative to provide an administrative alternative of a civil sanction; otherwise, it would be left to a prosecutor's discretion as to whether or not to bring criminal charges against an offender. *See* ORS 167.118. The alternative of a civil sanction would enable the agency to enforce sanctions against persons who operated bingo games without a license, even if there were no criminal prosecution. Thus,

the legislative history makes it clear that the legislature intended for ORS 464.470 to reach individuals operating bingo games who were not "applicants, licensees or permit holders."

Additionally, the legislature was concerned about charities hiring persons to run bingo games who would be paid substantial salaries. Tape Recording, Senate Committee on Government Operations, April 29, 1987, Tape 104, side A, at 250. To address its concern, the legislature enacted ORS 464.310(2):

> "No person other than a member or employee of a licensed organization, or any other person authorized under the rules of the Department of Justice, may participate in the management or operation of a licensed bingo, lotto or raffle operation. No person who participates in the management or operation of any such bingo, lotto, raffle, concession or related operation may concurrently participate in the management or operation of any other operation unless such participation is approved by the department."

Thus, the legislative history clarifies that DOJ's interpretation of ORS 464.470(1) in the context of the other applicable statutes is correct. The phrase "any person with an interest" was intended to reach other individuals as well as license holders. The legislature wanted to ensure that unlicensed individuals not profit from the operation of bingo games and provided the availability of civil penalties for that purpose.

■    Petitioner also argues that because a violation of ORS 167.118[2] is a crime, DOJ is not authorized by the legislature to enforce what would be a violation of a criminal statute in an administrative proceeding. He contends that such a violation is prosecutable only as a crime by a district attorney. The state responds that petitioner's argument ignores the plain text of ORS 464.470, which provides, in part:

---

[2] ORS 167.118 provides, in part:

"(1) When a charitable, fraternal or religious organization is licensed by the Department of Justice to conduct bingo, lotto or raffle games, only the organization itself or an employee thereof authorized by the Department of Justice shall receive money or property or otherwise profit in any manner from the operation of the games."

> "(1)   * * * Grounds for * * * civil penalty include, but are not limited to, cases in which * * * any person with an interest in the bingo, lotto or raffles operation * * *:
>
> "* * * * *
>
> "(b)  Has violated or has failed or refused to comply with ORS 167.117 to 167.164."

We agree with DOJ. The statute clearly authorizes DOJ to seek a civil sanction for a violation of ORS 167.117 to ORS 167.164.

PETITIONER'S ACTIVITIES UNDER ORS CHAPTER 464

■       The DOJ's order specifically states that petitioner violated ORS 464.470(1)(b) and ORS 464.470(1)(k) because he was not an employee or member of the licensee and derived compensation from and participated in the management and operation of licensed bingo operations. ORS 464.470(1)(b) provides that DOJ may impose a civil sanction when a person has participated in the management of a bingo operation in violation of ORS 464.310. ORS 464.470(1)(b) also allows DOJ to impose a civil sanction when a person other than the organization itself or an employee thereof profits in any manner from the operation of the bingo game in violation of ORS 167.118. ORS 464.470(1)(k) provides that DOJ may impose a civil sanction when a person "[h]as pursued or is pursuing economic gain in a manner or context which violates criminal or civil public body of this state." Petitioner was found to have violated ORS 464.470 because he managed and profited from bingo operations.

        Petitioner contends that he is not a person who "managed" or "profited" from the bingo operations at the BEO hall within the meaning of ORS chapter 464 as a matter of law. Petitioner points to OAR 137-25-040(3) and argues that it permits "a bingo licensee [to] contract with a third party to provide specific collateral services required for the proper and efficient operation of a bingo game." He maintains that he is a "third party" within the meaning of the rule because what he provided under his contract were "collateral services." In particular, petitioner argues that his services were similar to the list of examples that OAR 137-25-040(3)

specifically allows: bookkeeping/accounting services, payroll services, janitorial services, security services, construction services and legal services.

We note that OAR 137-25-040(3) is patterned after ORS 464.310(2), which provides that no person other than a member or employee of a licensed person or other person authorized under DOJ's rule may participate in "the management or operation" of a bingo game. The key to the resolution of the issue is in OAR 137-25-020(12), which defines "management or operation" to mean "supervising" the games. Under the rule, "supervise" means to

> "direct, oversee and inspect the work of others; to exercise authority with respect to decision-making or the implementing of decisions; and responsibility for the performance of functions integral to the operation of bingo and raffles, including operation of the games and operation of the facility used to conduct the games." OAR 137-25-020(14).

Thus, the issue becomes whether petitioner "supervised" a bingo operation. If "supervision" occurred, more than "collateral services" were provided as a matter of law. The ALJ found:

> "[Petitioner] became a middle management level operator of bingo gaming for the charities. [Petitioner's] activities represented a new management level for the control and operation needed to bring each Sponsor's bingo game back to profitability when threatened by a new competitor' [sic] bingo operation in the Salem area. In contrast to how the evidence established [petitioner's] role, he describes his activities merely as a facilitator, coordinator or advisor. However, a manager can also facilitate staff or motivate them for important changes needed in the operation of a business (in this case bingo gaming). A manager can also coordinate and advise."

Petitioner contends that "[t]he [ALJ's] understanding of the meaning of 'management' may be arguable as a matter of common parlance, but it does not address the elements of the rule." However, DOJ is entitled to apply its rule in any manner that is consistent with the language of the rule and underlying statutes. *City of Klamath Falls v. Environ. Quality Comm.*, 318 Or 532, 547, 870 P2d 825

(1994). Here, the ALJ's finding adopted by DOJ is analogous to finding that petitioner had the "responsibility for the performance of functions integral to the operation of bingo." That finding falls within the definition of "supervision" in OAR 137-25-020(14) and within the definition of "management" in OAR 137-25-020(12). Thus, the ALJ could have properly concluded that petitioner's activities constituted the "management" of the bingo games.

## COMPENSATION

Petitioner also assigns as error the ALJ's ruling that petitioner received payments in violation of the maximum limit on compensation that may be paid under OAR 137-25-040(5).[3] He contends that the ALJ improperly applied the rule to him, because it was only meant to apply to employees. He argues that the rule was adopted pursuant to ORS 464.250(9), which authorizes DOJ to

"establish maximum limits on compensation paid to persons employed by licensees, for the purpose of conducting licensed games, not to exceed 200 percent of the federal minimum wage standard, or in the case of a person who supervises a bingo game and is subject to the limitations of ORS 464.340, 300 percent of the federal minimum wage standard[.]"

The ALJ made specific findings and conclusions that petitioner violated the rule because he was compensated in excess of the maximum limit that may be paid under OAR 137-25-040(5). However, DOJ ultimately determined that petitioner had entered into an unlawful contract with seven different licensees and that each transaction was subject to a penalty of $10,000. ORS 464.470(2).[4] Thus, DOJ assessed its

---

[3] OAR 137-25-040(5) provides that

"In the event that compensation is paid to personnel for services related to the operation of bingo and raffle games, the compensation shall not exceed:

"(a) 200 percent of the federal minimum wage for nonsupervisory personnel; and

"(b) $300 percent [*sic*] of the federal minimum wage for supervisory personnel."

[4] ORS 464.470(2) provides:

"The department may also impose a civil penalty of not to exceed $10,000 for any violation of subsection (1) of this section."

sanctions on the basis of each contract that petitioner entered into and did not assess a penalty because petitioner received compensation in excess of the maximum limit that could be paid under OAR 137-25-040(5). Because the sanction imposed by DOJ was not based on the fact that petitioner received compensation in excess of the maximum limit under OAR 137-25-040(5), we need not address petitioner's argument regarding the interpretations of that rule.

## SUBSTANTIAL EVIDENCE

Finally, we have reviewed the record below for substantial evidence, ORS 183.482(8)(c), and conclude that there is substantial evidence to support DOJ's findings that petitioner participated in the management of the bingo operation at the BEO hall and that he also profited from his contracts with the sponsors at the BEO hall. Similarly, we are persuaded that in the light of our statutory and administrative rule interpretations, the ALJ's findings as to petitioner's activities and as adopted by DOJ regarding the BGCS hall are supported by substantial evidence. Moreover, we conclude that DOJ's civil sanction is supported by substantial evidence.

Affirmed.