Argued and submitted June 23; reversed on appeal, affirmed on cross-appeal
August 10, petition for review denied October 6, 2022 (370 Or 303)

Douglas R. MARTEENY,
District Attorney for Linn County, Oregon;
and Patricia W. Perlow, District Attorney
for Lane County, Oregon;
on behalf of all Oregonians and
Randy Tennant, an individual victim;
Samuel Williams, an individual victim;
Amy Jones, an individual victim; and
Melissa Grassl, an individual victim,
*Plaintiffs-Relators-Respondents
Cross-Appellants,*

*v.*

Katherine BROWN,
Governor of the State of Oregon;
Colette Peters, Director of Oregon
Department of Corrections;
Oregon Department of Corrections;
Dylan Arthur, Executive Director of Oregon
Parole Board and Post-Prison Supervision;
Michael Hsu, Chairperson of Oregon
Parole Board and Post-Prison Supervision;
Oregon Parole Board and Post-Prison Supervision;
Joe O'Leary, Director of Oregon Youth Authority;
and Oregon Youth Authority,
*Defendants-Respondents-Appellants
Cross-Respondents,*

*and*

Timothy ESPINOZA,
*Intervenor-Appellant.*

Marion County Circuit Court
22CV02609; A178127

517 P3d 343

In 2020 and 2021, Oregon Governor Kate Brown granted clemency to approximately 1,026 convicted felons, comprising three groups: (1) individuals "vulnerable to the effects of COVID-19," (2) individuals who had fought "the historic wildfires that ravaged the state around Labor Day 2020," and (3) 73 individuals who were sentenced as juveniles before the passage of Senate Bill (SB) 1008

(2019), section 25 of which was codified as ORS 144.397. SB 1008 made substantial changes to the prosecution and sentencing of juvenile offenders, including providing for early release hearings, conducted by the Board of Parole and Post-Prison Supervision, after 15 years of incarceration. The legislature did not make SB 1008 retroactive. The effect of the Governor's commutation order for these 73 individuals was to afford them the same procedure, under ORS 144.397, that would be afforded to a juvenile offender convicted today. Two groups of relators—Douglas Marteeny, Linn County District Attorney, and Patricia Perlow, Lane County District Attorney, and four family members of victims of the crimes of which some of the youth prisoners were convicted—petitioned the Marion County Circuit Court for a writ of mandamus directing the Governor, the Department of Corrections, the Oregon Youth Authority, and the Board of Parole and Post-Prison Supervision "to honor and follow all procedural and substantive provisions of Oregon law." In their legal arguments, relators argue that the commutations here were procedurally flawed, and unlawful for a variety of reasons. But underlying those technical arguments exists a palpable emotion that deserves acknowledgement: relators feel that they have been denied justice. *Held*: The Court of Appeals explained that clemency power of presidents and governors traces its origins to the earliest days of English common law. The arguments and emotions present in this case echo through the centuries. The power to pardon, sitting within a singular executive—be they monarch, president, or governor—has always been controversial, seemingly at odds with legislative determination and judicial decision-making. Whenever it has been used, it has been lauded by some, and condemned by others. The court was not called on to judge the wisdom of the Governor's clemency of these 1,026 individuals; that is a political question. The court was tasked solely with determining her authority to do so under Oregon law. And on that narrow question, the court concluded that the commutations at issue were a lawful exercise of the broad clemency power afforded Oregon governors by constitution and statute.

Reversed on appeal; affirmed on cross-appeal.


David E. Leith, Judge.

Benjamin Gutman, Solicitor General, argued the cause for appellants-cross-respondents. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Kirsten M. Naito, Assistant Attorney General.

Kevin L. Mannix argued the cause for respondents-cross-appellants. Also on the briefs was Kevin L. Mannix, P. C.

Gabe Newland argued the cause for intervenor-appellant Timothy Espinoza. Also on the brief was Jody M. Davis.

Venetia Mayhew argued the cause *amicus curiae* for Criminal Justice Reform Clinic at Lewis & Clark Law School. Also on the brief was Aliza Kaplan.

Before James, Presiding Judge, and Aoyagi, Judge, and Pagán, Judge.

JAMES, P. J.

Reversed on appeal; affirmed on cross-appeal.

**JAMES, P. J.**

In 2020 and 2021, Oregon Governor Kate Brown granted clemency to approximately 1,026 convicted felons, comprising three groups: (1) individuals "vulnerable to the effects of COVID-19," (2) individuals who had fought "the historic wildfires that ravaged the state around Labor Day 2020," and (3) 73 individuals who were sentenced as juveniles before the passage of Senate Bill (SB) 1008 (2019), section 25 of which was codified as ORS 144.397. SB 1008 made substantial changes to the prosecution and sentencing of juvenile offenders, including providing for early release hearings, conducted by the Board of Parole and Post-Prison Supervision (BOPPS), after 15 years of incarceration. The legislature did not make SB 1008 retroactive. The effect of the Governor's commutation order for these 73 individuals was to afford them the same procedure, under ORS 144.397, that would be afforded to a juvenile offender convicted today.

Two groups of relators—Douglas Marteeny, Linn County District Attorney, and Patricia Perlow, Lane County District Attorney (the DA relators), and four family members of victims of the crimes of which the some of the youth prisoners were convicted (the victim relators)—petitioned the Marion County Circuit Court for a writ of mandamus directing the Governor, the Department of Corrections (DOC), the Oregon Youth Authority (OYA), and BOPPS "to honor and follow all procedural and substantive provisions of Oregon law." In their legal arguments, relators argue that the commutations here were procedurally flawed, and unlawful for a variety of reasons that we detail below. But underlying those technical arguments exists a palpable emotion that deserves acknowledgement: relators feel that they have been denied justice.

As we detail below, the clemency power of presidents and governors traces its origins to the earliest days of English common law. The arguments and emotions present in this case echo through the centuries. The power to pardon, sitting within a singular executive—be they monarch, president, or governor—has always been controversial, seemingly at odds with legislative determination and judicial decision-making. Whenever it has been used, it has

been lauded by some, and condemned by others. We are not called here to judge the wisdom of the Governor's clemency of these 953 individuals; that is a political question. We are tasked solely with determining her authority to do so under Oregon law. And on that narrow question, we conclude that the commutations at issue here were a lawful exercise of the broad clemency power afforded Oregon governors by constitution and statute.

## I.  INTRODUCTION

The power of the Governor to pardon is enshrined in the Oregon Constitution. Article V, section 14 provides:

> "[The Governor] shall have power to grant reprieves, commutations, and pardons, after conviction, for all offences except treason, subject to such regulations as may be provided by law. Upon conviction for treason he shall have power to suspend the execution of the sentence until the case shall be reported to the Legislative Assembly, at its next meeting, when the Legislative Assembly shall either grant a pardon, commute the sentence, direct the execution of the sentence, or grant a farther reprieve."

In furtherance of this constitutional power, the Oregon legislature has enacted several statutes. ORS 144.649 recognizes the broad power of clemency and states that power is subject to the "conditions and with such restrictions and limitations as the Governor thinks proper."[1] ORS 144.650 creates a series of procedures for pardon applications, including notification to district attorneys and victims, empowers the governor to gather information, and provides certain timing mechanisms.[2] ORS 144.660 requires

---

[1]  ORS 144.649 provides:

"Upon such conditions and with such restrictions and limitations as the Governor thinks proper, the Governor may grant reprieves, commutations and pardons, after convictions, for all crimes and may remit, after judgment therefor, all penalties and forfeitures."

[2]  ORS 144.650 provides:

"(1)  When an application for a pardon, commutation or remission is made to the Governor, a copy of the application, signed by the person applying and stating fully the grounds of the application, shall be served upon:

"(a)  The district attorney of the county where the conviction occurred;

"(b)  If the person applying is housed in a correctional facility within the State of Oregon, the district attorney of the county in which the correctional facility is located;

the Governor to report clemency actions to the legislature.[3]

"(c) The State Board of Parole and Post-Prison Supervision; and

"(d) The Director of the Department of Corrections.

"(2) Proof by affidavit of the service shall be presented to the Governor.

"(3) Upon receiving a copy of the application, the district attorney of the county where the conviction occurred shall:

"(a) Notify the victim of the crime concerning the application and the victim's right to provide the Governor with any information relevant to the Governor's decision;

"(b) Provide the Governor with any information relevant to the Governor's decision that the victim wishes to have provided; and

"(c) Provide the Governor with copies of the following documents:

"(A) Police and other investigative reports;

"(B) The charging instrument;

"(C) The plea petition, if applicable;

"(D) The judgment of conviction and sentence;

"(E) Any victim impact statements submitted or filed; and

"(F) Any documents evidencing the applying person's payment or non-payment of restitution or compensatory fines ordered by the court.

"(4) In addition to providing the documents described in subsection (3) of this section, upon receiving a copy of the application for pardon, commutation or remission, any person or agency named in subsection (1) of this section shall provide to the Governor as soon as practicable such information and records relating to the case as the Governor may request and shall provide further information and records relating to the case that the person or agency considers relevant to the issue of pardon, commutation or remission, including but not limited to:

"(a) Statements by the victim of the crime or any member of the victim's immediate family, as defined in ORS 163.730;

"(b) A statement by the district attorney of the county where the conviction occurred; and

"(c) Photos of the victim and the autopsy report, if applicable.

"(5) Following receipt by the Governor of an application for pardon, commutation or remission, the Governor shall not grant the application for at least 30 days. Upon the expiration of 180 days, if the Governor has not granted the pardon, commutation or remission applied for, the application shall lapse. Any further proceedings for pardon, commutation or remission in the case shall be pursuant only to further application and notice."

[3] ORS 144.660 provides:

"The Governor shall report to the Legislative Assembly in the manner provided in ORS 192.245 each reprieve, commutation or pardon granted since the previous report to the Legislative Assembly required by this section. The report shall include, but not be limited to the reason for granting the reprieve, commutation or pardon, the name of the applicant, the crime of which the applicant was convicted, the sentence and its date, statements by the victim of the crime or any member of the victim's immediate family, as defined in ORS 163.730, a statement by the district attorney where the conviction was had, photos of the victim, the autopsy report, if applicable, and

Finally, ORS 144.670 addresses recordkeeping after the Governor grants clemency.[4]

Relators' arguments as to why the commutations here were unlawful can roughly be divided into thirds: their procedural argument, their delegation argument, and their jurisdiction argument. As to procedure, relators argue on cross-appeal that ORS 144.650, while not substantively limiting the Governor's clemency power, sets forth mandatory procedures that govern clemency applications. They then reason that a grant of clemency therefore *requires* an application, either from the applicant, or an application from the Governor to herself. As such, they argue, once an application is submitted, even an application from the Governor to herself, the Governor is obligated, per ORS 144.650, to seek the input of district attorneys and crime victims prior to a grant of clemency.

Relator's delegation argument advanced on appeal[5] applies solely to the 73 juvenile offenders. There, they argue that the Governor unlawfully delegated her clemency power to BOPPS by providing the juvenile offenders the right to a hearing of the kind established in ORS 144.397.

---

the date of the commutation, pardon or reprieve. The Governor shall communicate a like statement of particulars in relation to each case of remission of a penalty or forfeiture, with the amount remitted."

[4] ORS 144.670 provides:

"When the Governor grants a reprieve, commutation or pardon or remits a fine or forfeiture, the Governor shall within 10 days thereafter file all the papers presented to the Governor in relation thereto, including any documents provided under ORS 144.650(3) or (4), in the office of the Secretary of State, by whom they shall be kept as public records, open to public inspection."

[5] Before the trial court relators made a second delegation argument, that the Governor unlawfully delegated her clemency power to DOC and OYA by requesting from them lists of offenders who met criteria that she had established to guide her in exercising her clemency power. On appeal relators advance no argument on this point. Accordingly, we do not consider the correctness of the circuit court's conclusion that the Governor did not unlawfully delegate her clemency power to DOC or OYA. Similarly, we do not address the sufficiency of the Governor's reports to the legislature and documentation of her actions; the circuit court reasoned that it did not need to reach those issues in light of its conclusion that ORS 144.650 did not apply to the challenged actions, and relators do not challenge that aspect of its reasoning. "We rely on parties to frame the contours of the legal issues presented in a case, and we will not endeavor to fill the void purposefully created by a party's tactical choices." *State v. Kamph*, 297 Or App 687, 694-95, 442 P3d 1129 (2019).

Finally, in their jurisdictional argument, also raised on appeal, which again only applies to the 73 juvenile offenders, relators argue that BOPPS lacked jurisdiction to hold hearings or consider release for offenders convicted as juveniles but sentenced before the passage of ORS 144.397, and that the Governor could not expand BOPPS's jurisdiction.

The circuit court rejected most of relators' arguments, but as to the 73 juvenile offenders held that the Governor could not "lawfully expand administrative jurisdiction," and that her order had expanded the jurisdiction of BOPPS. The court issued a peremptory writ ordering BOPPS, its director, and its executive director not to "exercise authority purportedly provided by executive commutation order to conduct any release hearing or carry out any early release process for any offender who was found guilty of an offense while the offender was a juvenile, but whose offense was not within the prospective scope of SB 1008 (2019)."

Defendants—the Governor, BOPPS, DOC, and OYA[6]—appeal, arguing that the trial court erred in concluding that relators had authority or standing to bring this mandamus action, and further erred in concluding that BOPPS lacked authority to carry out the hearings the clemency grants provided. Relators cross-appeal, arguing that none of the 1,026 clemency grants at issue here followed the required procedures. However, at oral argument they clarified that they do not assert that the failure to follow these procedures with respect to the COVID or wildfire grants renders them void, or invalid. Instead, as to the COVID and wildfire clemency grants, relators ask us to leave those undisturbed, but enjoin the Governor from any future clemency grants that do not follow the procedures of ORS 144.650. However, relators do appear to argue that the failure to follow procedures renders the 73 juvenile grants unlawful. Relators further defend the circuit court's reasoning, arguing that the Governor could not delegate the

_____

[6] Our references to defendants include the Governor, the agencies listed in the text, Colette Peters, Director of DOC, Dylan Arthur, Executive Director of BOPPS, Michael Hsu, Chairperson of BOPPS, and Joe O'Leary, Director of OYA.

release decision to BOPPS, with the result that the grants of clemency to the youth offenders are at least unenforceable, if not void.[7]

The contours of the dispute so framed, we turn to our analysis. The resolution of these issues is complex. We begin our task, in Section II, with an examination of the pardon power historically. Following that, in Section III, we turn to the predicate issues of relators' authority to commence this action, and standing, respectively. As we explain, our resolution of the standing question in this case requires some amount of reverse analysis—compelling us to evaluate the merits of relators' arguments. Therefore, in Section IV we turn to the effect of ORS 144.650 and whether that statute provides a standing basis. Finally, continuing the reverse analysis approach begun in Section IV, we turn in Section V to focus on the whether the Governor improperly delegated release to BOPPS, and whether BOPPS had authority to hold hearings for the 73 juvenile offenders.

## II.   THE HISTORY OF THE PARDON POWER

Neither the Oregon constitutional clemency power, nor the statutes enacted surrounding it, are unique; they are but one small fragment in a long historical debate about pardons. In 1789, this nation's founders were well accustomed to the centuries-old understanding that "the king may extend his mercy on what terms he pleases, and consequently may annex to his pardon any condition that he thinks fit, whether precedent or subsequent, on the performance whereof the validity of the pardon will depend." William Hawkins, 2 *Pleas of the Crown* 557 (6th ed 1787). Oregon's constitutional clemency power, and the attempts to legislatively constrain it, cannot be understood outside this larger historical context. Accordingly, we begin in the past.

The power to pardon dates back at least to the seventh century, where note of it is made in the Laws of Ine, of

---

[7] Also appearing on appeal are intervenor, who is one of the juvenile offenders affected by the Governor's clemency order, and *amicus curiae* Criminal Justice Reform Clinic at Lewis & Clark Law School.

Wessex, which survive, in part, due to their later appendage to the Laws of Alfred. Stefan Juranski and Lisi Oliver, *The Laws of Alfred: The Domboc and the Making of Anglo Saxon Law* 364-84 (Cambridge University Press 2021). By the fourteenth century, pardons had developed into forms and uses that are not dissimilar from modern times.

Individual pardons were granted from the monarch to a person to spare punishment for a specific act. This practice, in part, supplemented the lack of development of defenses in English law. For example, homicide in self-defense was punishable at law, but usually recommended by the justices of the king's court to the Chancellery for royal pardon, which was rarely declined. Naomi D. Hurnard, *The King's Pardon for Homicide Before A. D. 1307* 70-95 (Oxford University Press 1969).

Individual pardons often were initiated by petition, sometimes from the convicted person themselves, with legal assistance, but more commonly through an intermediary—the justice of the court, a member of the clergy, or a political patron. *See, e.g.*, J. C. Parsons, "The Intercessionary Patronage of Queens Margaret and Isabella of France," in *Thirteenth Century England VI*, 145-49 (Woodbridge 1997). The grant of an individual pardon, however, was not required to be initiated by petition. Occasionally the monarch would issue an individual pardon without invitation. Sometimes these grants corresponded with particular holidays, but sometimes they were simply spur of the moment. In 1392, for example, Richard II pardoned a criminal in the middle of a procession through London, to emphasize his reconciliation of a political dispute. A. G. Rigg, *History of Anglo-Latin Literature, 1066-1422* 285-86 (Cambridge University Press 1993).

In addition to individual pardons, group or mass pardons existed, which operated in a similar manner but captured a category of offender. Participants in uprisings, those accused of riot, or groups of debtors were often the recipients of mass pardons. Sometimes the group was exceptionally large. In 1294, for example, Edward I issues a mass pardon to all felons in the kingdom on the condition that the person volunteer for military service.

By the fourteenth century, pardons of both individuals and large masses of felons were common.[8] However, this practice was not without criticism and controversy.

"While the king's right to pardon was largely unchallenged, the way in which the prerogative was to be used certainly became the focus of extensive debate. \*\*\* The need for kings to retain discretionary powers went unquestioned \*\*\* [But] it was instances when the king intervened before trial, or went against the decision of a court, that caused concern."

Helen Lacey, *The Royal Pardon: Access to Mercy in Fourteenth-Century England* 73-74 (York Medieval Press 2009).

One area of concern was whether the monarch could, or should, issue pardons before accusations were heard in court. The controversy around the timing of pardons, coming before or after trial, was intertwined both with notions of the value of a public airing of grievances, along with beliefs about the authority to pardon generally. Some contemporary critics argued that only particular circumstances—after being found by the courts—for example, excusable homicide, should benefit from the king's mercy. The 1278 Statute of Gloucester attempted to codify this argument by seeking to require that "all defendants were to put themselves 'upon the country' and stand trial before receiving pardon." *Id*. at 75. Such limits were mostly symbolic, however; effectively, the crown recognized few limits on the pardon power.

Additionally, in the case of group or mass pardons, Parliament often sought to play a larger role, sometimes seeking to offer advice to the monarch, but at a minimum seeking notice of such pardons.

"Throughout the fourteenth century, the subject of pardon repeatedly found its way on to the parliamentary agenda in a variety of contexts. \*\*\* [B]y at least the middle of the century most grants of mercy were being discussed by the Lords and shire representatives."

*Id*. at 85-87.

---

[8] Other forms of pardon existed at English law, such as the general pardon. We focus on individual and mass pardons simply because those two types bear the most historical relevance to the matter before us.

Finally, given that the majority of individual pardons began with a petition, the truth and veracity of pardon petitions was a subject of considerable public concern at the time, and resulted in several attempts to legislate procedures for petitioning for individual pardons, most of which were designed to facilitate accuracy:

"In 1353 the parliamentary Commons sought to address the issue head on, and a statute was drafted which declared that charters of pardon had in the past been issues 'upon feigned and untrue suggestions of divers people, whereof much evil hath chanced in times past.' To counter this it introduced the requirement that every charter of pardons granted at the suggestion of an intercessor would record the name of the patron, and the reasons put forward to secure the pardon. The justices before whom such charters were presented were to enquire into these particulars, and if they found them to be untrue they were to reject the charter."

*Id.* at 48.

The use of individual, as well as mass pardons, continued from the fourteenth century up to the time of America's founding. Individual pardons had been growing in usage by the British crown as a way to mitigate increasingly punitive criminal law:

"[T]he continued use of royal pardons in eighteenth-century England served to promote a belief in the fairness and equity of a legal system that upheld the propertied interests of the ruling elite. While the government expanded the number of crimes punishable by death, it mitigated the severity of the law with the use of royal pardons, and therefore kept the populace in a deferential relationship with the ruling class."

*Id.* at 5 (discussing Douglas Hay, "Property, Authority and the Criminal Law," in *Albion's Fatal Tree: Crime and Society in Eighteenth Century England*, 17 (Pantheon 1975)).

Mass pardons, as well, had continued unabated up until America's founding. King George I attempted to curtail piracy in the Americas through an act of mass pardon in the "Proclamation for Suppressing of Pirates" of 1717:

"We do hereby Promise and Declare, That in case any of the said Pirates shall, on or before the Fifth Day of September, in the Year of our Lord One thousand seven hundred and eighteen, Surrender him or themselves to One of Our Secretaries of State in Great Britain or Ireland, or to any Governor or Deputy Governor of Our Plantations or Dominions beyond the Seas, every such Pirate and Pirates, so Surrendering him or themselves, as aforesaid, shall have Our Gracious Pardon of and for such his or their Piracy or Piracies, by him or them Committed before the Fifth Day of January next ensuing."

King George I of Great Britain, "1717, September 5. A Proclamation for Suppressing of Pirates," in *British Royal Proclamations Relating to America, 1603-1783*, 176-77 (Clarence Saunders Brigham, ed.) (Burt Franklin 1911). The Governor of the Virginia colony, William Berkeley, issued a mass pardon of nearly 300 persons connected to the 1676 Jamestown rebellion. And in Massachusetts, the participants in Shays's rebellion were pardoned by Governor Hancock, after previously having been sentenced to death, in 1788. Leonard L. Richards, *Shays's Rebellion: The American Revolution's Final Battle* 138-60 (University of Pennsylvania Press 2002).

When America's founders took up the task of crafting a constitution, the pardon power was given relatively little attention. Perhaps the best discussion occurs in Federalist Paper No. 74 where Alexander Hamilton writes:

"Humanity and good policy conspire to dictate, that the benign prerogative of pardoning should be as little as possible fettered or embarrassed. \* \* \* The criminal code of every country partakes so much of necessary severity, that without an easy access to exceptions in favor of unfortunate guilt, justice would wear a countenance too sanguinary and cruel. As the sense of responsibility is always strongest, in proportion as it is undivided, it may be inferred that a single man would be most ready to attend to the force of those motives which might plead for a mitigation of the rigor of the law, and least apt to yield to considerations which were calculated to shelter a fit object of its vengeance. The reflection that the fate of a fellow-creature depended on his sole fiat, would naturally inspire scrupulousness and caution; the dread of being accused of weakness or connivance,

would beget equal circumspection, though of a different kind."

The Federalist No. 74, at 473-74 (Alexander Hamilton) (Benjamin Fletcher Wright ed., 1961).

Unquestionably, the founders were well aware of the history and uses of pardons in English law, from individual to mass pardons, as well as the various historical criticisms of the power: the issues of pretrial pardons, substantive versus procedural limitations, legislative notice, and accuracy in pardon petitions. For example, at the Virginia ratifying convention in 1788, George Mason voiced the concern—one that had existed in English law for centuries—of pardons occurring pretrial: "If he has the power of granting pardons before indictment, or conviction, may he not stop inquiry and prevent detection?" Graham Dodds, *Mass Pardons in America: Rebellion, Presidential Amnesty, and Reconciliation* 29 (Columbia University Press 2021). However, the discussions around the pardon power at the time of the founding considered primarily the limitation of impeachment. As the Supreme Court summarized:

> "This limitation as to impeachments tracked a similar restriction upon the English royal prerogative which existed in 1787. An effort was made in the Convention to amend what finally emerged as s 2, cl. 1, and is reflected in James Madison's Journal for August 25, 1787, where the following note appears:
>
>> "'Mr. Sherman moved to amend the "power to grant reprieves and pardons" so as to read "to grant reprieves until the next session of the Senate, and pardons with consent of the Senate." 2 M. Farrand, Records of the Federal Convention of 1787, p. 419 (1911).'
>
> "The proposed amendment was rejected by a vote of 8-1. *Ibid*. This action confirms that, as in England in 1787, the pardoning power was intended to be generally free from legislative control."

*Schick v. Reed*, 419 US 256, 262-63, 95 S Ct 379, 42 L Ed 2d 430 (1974) (internal citation omitted).

Other potential limitations were considered, but also rejected.

"Later Edmund Randolph proposed to add the words 'except cases of treason.' \*\*\* Randolph's proposal was rejected by a vote of 8-2, and the clause was adopted in its present form. Thereafter, Hamilton's Federalist No. 69 summarized the proposed s 2 powers, including the power to pardon, as 'resembl(ing) equally that of the King of Great-Britain and the Governor of New-York.' The Federalist No. 69, p. 464 (J. Cooke ed. 1961)."

*Id*. at 263.

Accordingly, the presidential pardon power enshrined in Article II, section 2, of the United States Constitution is functionally indistinguishable from the power of the English crown to pardon that was in existence in 1789, and which had been operating materially the same way for 500 years:

"[T]he language used in the constitution, conferring the power to grant reprieves and pardons, must be construed with reference to its meaning at the time of its adoption. At the time of our separation from Great Britain, that power had been exercised by the king, as the chief executive. Prior to the revolution, the colonies, being in effect under the laws of England, were accustomed to the exercise of it in the various forms, as they may be found in the English law books. They were, of course, to be applied as occasions occurred, and they constituted a part of the jurisprudence of Anglo-America. At the time of the adoption of the constitution, American statesmen were conversant with the laws of England, and familiar with the prerogatives exercised by the crown. Hence, when the words to grant pardons were used in the constitution, they conveyed to the mind the authority as exercised by the English crown, or by its representatives in the colonies. At that time both Englishmen and Americans attached the same meaning to the word pardon. In the convention which framed the constitution, no effort was made to define or change its meaning, although it was limited in cases of impeachment."

*Ex parte Wells*, 59 US (18 How) 307, 311, 15 L Ed 421 (1855).

The first mass pardon occurred very quickly after the founding of the nation. On July 10, 1795, President Washington pardoned the participants in the Whiskey rebellion:

> "I have since thought proper to extend the said pardon to all persons guilty of the said treasons, misprisons of treason, or otherwise concerned in the late insurrection within the survey aforsaid who have not since been indicted or convicted thereof, or of any other offense against the United States."

George Washington, "Proclamation Granting Pardon to Certain Persons Formerly Engaged in Violence and Obstruction of Justice in Protest of Liquor Laws in Pennsylvania," July 10, 1795, American Presidency Project, ed. Gerhard Peters and John Woolley, https://www.presidency.ucsb.edu/node/206665 (last accessed August 4, 2022).

Later, in 1800, President Adams issued a series of individual and mass pardons in response to Fries's Rebellion in Pennsylvania against the federal government's levying of a house tax. Adams instructed the Attorney General to both prepare the pardon and identify the individuals who would qualify:

> "I pray you therefore to prepare, for my Signature this morning a Pardon for each of the criminals John Fries, Frederick Hainey and John Gettman. I pray you allso [*sic*] to prepare the Form of a Proclamation of a General Pardon of all Treasons and Conspiracies to commit Treasons heretofore committed in the three offending Counties in opposition to the Law laying Taxes on Houses ***.

> "I have one request more, that you would *** report to me a List of the Names of Such, if there are any, as may be proper Object of the Clemency of government."

Letter from John Adams to Charles Lee (May 21, 1800), Founders Online, National Archives, https://founders.archives.gov/documents/Adams/99-02-02-4356 (last accessed Aug 4, 2022).

At the time of Oregon's constitutional founding in 1859, the power to pardon was particularly in the minds of the nation. A year earlier, on April 6, 1858, President Buchanan had issued a pardon to the Mormon residents of Utah for crimes committed over the previous year in an escalating series of incidents that came to be known as the Utah War.

The framers of Oregon's constitution carried this historical understanding and context into their own considerations of the pardon power. Critically, they considered, then rejected, legislative oversight over pardons. An earlier version of Article V, section 14, contained a provision that would have permitted the legislature to "'constitute a council, to be composed of officers of State without whose advice and consent the governor shall not have power to grant pardons in any case, except such as may by law be left to his sole power.'" Claudia Burton, *A Legislative History of the Oregon Constitution of 1857—Part II (Frame of Government: Articles III-VII)*, 39 Willamette L Rev 245, 365 (2003) (quoting Article on Executive Department (As Introduced) § 14 (1857)). That was rejected however, and instead Oregon adopted the traditional unitary executive model inherited from English common law.

Article V, section 14, does offer some limitations not present in the federal constitution. First, Article V, section 14, provides that the pardon power shall be "subject to such regulations as may be provided by law." However, as the Oregon Supreme Court has noted, the few statutory provisions enacted "address procedural issues ***. The lone provision addressing the scope of the Governor's power, ORS 144.649, restates the Governor's constitutional power, but also expresses the legislature's intent to defer to the Governor's judgment." There has never been an attempt to substantively regulate the Governor's pardon power:

> "There have been no regulations governing the exercise of the pardoning power provided by law, except the declaration in section 1572, B. & C. Comp., [(now codified as ORS 144.649)] that reprieves, commutations, and pardons may be granted by the Governor upon such conditions and with such restrictions and limitations as he may think proper, which is but a restatement of the law as it exists without legislative action. It has everywhere been held, so far as we have been able to ascertain, that under a Constitution like ours a pardon is a mere act of grace, and the pardoning power may attach to it any condition precedent or subsequent that is not illegal, immoral, or impossible of performance[.]"

*Ex parte Houghton*, 49 Or 232, 234, 89 P 801 (1907).

The second differentiator between Article V, section 14, and the federal constitution is that it invests the Governor with pardon power only "after conviction," a detail that echoes the debate in English common law that had existed since the fourteenth century. Finally, Article V, section 14, limits the Governor's power in cases of treason.

"In contrast to the President's clemency power—which extends to all '[o]ffences against the United States' except those involving impeachment—in cases of treason, the Governor essentially can grant only a reprieve, rather than a commutation or pardon, and the reprieve is effective only until the legislature's next meeting."

*Haugen v. Kitzhaber*, 353 Or 715, 727, 306 P3d 592 (2013) (footnote omitted). Except for those modifications, the pardon power provided to Oregon governors accords with the power as set forth in the federal constitution, which is itself modeled on the pardon power of monarchs in English common law. That power "is plenary." *Id.* at 722.

### III.   AUTHORITY AND STANDING

With that historical background in mind, we now turn to the specific arguments advanced by the parties in this case. But first, we must determine *who* those parties are. For relators Marteeny and Perlow we must determine if they are bringing this action as private citizens, or in their official public capacity as district attorneys of their respective counties. If the latter, we must then decide if they have the authority to bring this action. Finally, for all the relators in this case, we must consider if they have standing.

### A.   *The Authority of District Attorneys*

The original Article VII of the Oregon Constitution defined a significant role for district attorneys, known as prosecuting attorneys, in our state judicial system. Article VII (Original), section 17, provided as follows:

"There shall be elected by districts comprised of one, or more counties, a sufficient number of prosecuting Attorneys, who shall be the law officers of the State, and of the counties within their respective districts, and shall perform such duties pertaining to the administration of

Law, and general police as the Legislative Assembly may direct.”

In 1909, the Supreme Court explained that “[t]he office of prosecuting attorney is provided for, and its duties defined, in part, by the Constitution. The office therefore cannot be abolished or the constitutional duties thereof abridged by the Legislature.” *State v. Walton*, 53 Or 557, 561, 99 P 431 (1909) (citation omitted).

However, in 1910, Article VII was amended. As amended, Article VII did not contain any provisions relating to district attorneys.[9] However, it did provide that “[t]he courts, jurisdiction, and judicial system of Oregon, except so far as expressly changed by this amendment, shall remain as at present constituted until otherwise provided by law.” Article VII (Amended), section 2.

In 1925, a district attorney brought a *quo warranto* proceeding challenging the governor’s appointment of a special prosecutor who, against the district attorney’s wishes, was tasked with investigating and prosecuting violations of the prohibition law in the district attorney’s county. *State v. Farnham*, 114 Or 32, 34-35, 234 P 806 (1925). The court observed that “[w]hen the powers [conferred by the statute that allowed the appointment] are exercised by the Governor and his appointees it diverts [*sic*: divests] the prosecuting attorneys of the state and vests in the appointees of the Governor the power to control the prosecution of that class of criminal actions in the courts of their districts.” *Id.* at 36. Under Article VII (Original), the court noted, the special prosecutor appointment would have been unconstitutional:

---

[9] The only mention of district attorneys in the version of Article VII (Amended) enacted in 1910 was one sentence in section 5:

“No person shall be charged in any circuit court with the commission of any crime or misdemeanor defined or made punishable by any of the laws of this State, except upon indictment found by a grand jury; provided, however, that any district attorney may file an amended indictment whenever an indictment has, by a ruling of the court, been held to be defective in form.”

Official Voters’ Pamphlet, General Election, Nov 8, 1910, 202.

In 1974, the original section 5 of Article VII (Amended) was repealed and a new version enacted. Subsections 4, 5, and 6 of the new version provide procedures for district attorneys’ charging decisions (providing the circumstances in which felonies may be charged by information) and amended indictments and informations.

"Prior to the amendment, the power to prosecute criminal actions within their districts, regardless of the nature of the charge, was, by section 17 of article 7, vested in the duly elected and acting prosecuting attorneys or their deputies." *Id.*

However, the court explained that, after the amendment of Article VII, the provisions of the original Article VII that remain in force as a result of Article VII (Amended), section 2, "continue in force only until changed by the Legislature." *Id.* at 42. In other words, "[t]he effect of amended section 2 was to retain the provisions of the original Article VII only until changed by the legislature." *State v. Coleman*, 131 Or App 386, 390, 886 P2d 28 (1994), *rev den*, 320 Or 588 (1995). Thus, the statute allowing the governor to appoint a special prosecutor was constitutional under amended Article VII. *Farnham*, 114 Or at 48.

Thus, the role of Oregon district attorneys is now statutory, rather than constitutional. *State ex rel. v. Farrell*, 175 Or 87, 92, 151 P2d 636 (1944) (adhering to *Farnham*'s holding that "the office of district attorney is no longer a constitutional office"). The legislature has established district attorneys' authority and duties in a series of statutes in ORS chapter 8. ORS 8.610 - 8.652.

The legislature has given much of the responsibility originally vested only in district attorneys by original Article VII to the Attorney General. The Attorney General has the same powers as district attorneys. ORS 180.240 ("The Attorney General and the Department of Justice shall have the same powers and prerogatives in each of the several counties of the state as the district attorneys have in their respective counties."); *see also Farnham*, 114 Or at 34-35 (under Article VII (Amended), it was constitutional for the legislature to provide for the governor to appoint a special prosecutor for all prohibition law violations in the district attorney's county, even against the district attorney's will). However, the Attorney General, rather than district attorneys, is now the "the chief law officer for the state and all its departments." ORS 180.210. As such, the legislature has given the Attorney General supervisory authority over district attorneys' core functions: "The Attorney General

shall consult with, advise and direct the district attorneys in all criminal causes and matters relating to state affairs in their respective counties." ORS 180.060(5).

The legislature has designated the Attorney General as the head of the Department of Justice, ORS 180.210, which is exclusively responsible for asserting the state's legal interests:

"(1)   The Department of Justice shall have:

"(a)   General control and supervision of all civil actions and legal proceedings in which the State of Oregon may be a party or may be interested.

"(b)   Full charge and control of all the legal business of all departments, commissions and bureaus of the state, or of any office thereof, which requires the services of an attorney or counsel in order to protect the interests of the state.

"(2)   No state officer, board, commission, or the head of a department or institution of the state shall employ or be represented by any other counsel or attorney at law."

ORS 180.220.

Further, the legislature has entrusted to the Attorney General the responsibility of evaluating whether conflicts of interest exist as a result of the exclusive role of the Department of Justice and, if the Attorney General decides that they do, taking appropriate action:

"Notwithstanding any provision of law to the contrary, whenever the Attorney General concludes that it is inappropriate and contrary to the public interest for the office of the Attorney General to concurrently represent more than one public officer or agency in a particular matter or class of matters in circumstances which would create or tend to create a conflict of interest on the part of the Attorney General, the Attorney General may authorize one or both of such officers or agencies to employ its own general or special counsel in the particular matter or class of matters and in related matters. Such authorization may be terminated by the Attorney General whenever the Attorney General determines that separate representation is no longer appropriate."

ORS 180.235(1).

Finally, as relevant here, the legislature has provided that, when district attorneys conduct prosecutions, they do so "on behalf of the state": "The district attorney shall attend the terms of all courts having jurisdiction of public offenses within the district attorney's county, and *** conduct, on behalf of the state, all prosecutions for such offenses therein." ORS 8.660(1); *see also Coleman*, 131 Or App at 390 ("[T]he legislature has expressly designated district attorneys as prosecutors on behalf of the state." (Internal quotation marks omitted.)).

Relators point out that the legislature has provided that some of the Attorney General's powers that we have described above do not displace similar powers of district attorneys that arise from some other source. ORS 180.070 provides, as follows:

"(1)  The Attorney General may, when directed to do so by the Governor, take full charge of any investigation or prosecution of violation of law in which the circuit court has jurisdiction.

"* * * * *

"(4)  The power conferred by this section, ORS 180.060 [(powers and duties of Attorney General)], 180.220 [(powers and duties of Department of Justice)] or 180.240 [(Attorney General and Department of Justice to have powers and prerogatives of district attorneys)] does not deprive the district attorneys of any of their authority, or relieve them from any of their duties to prosecute criminal violations of law and advise the officers of the counties composing their districts."

At oral argument, relators pointed to ORS 180.070(4) as indicating that, notwithstanding the statutes set out further above, they still have inherent authority, by virtue of their role as district attorneys, to bring the claims at issue on behalf of all Oregonians. We disagree.

A district attorney's authority to act on behalf of the state is limited to the district attorney's district. *Farrell*, 175 Or at 94 (Statutes defining the role of district attorneys "confine the district attorney strictly to the counties within his district, and, at the same time that they delineate his duties, limit his authority. The requirement of § 93-906,

OCLA (Oregon Compiled Laws Annotated), that he shall 'in like case, prosecute or defend, as the case may be, all actions, suits, or proceedings in any county in his district to which the state or such county may be a party,' is inconsistent with the claim that he may go outside of his district, to inaugurate, in his official capacity, a case in which the state is a party."). Thus, Marteeny and Perlow, the district attorneys of Linn and Lane Counties, are not empowered to bring a proceeding in Marion County.

Moreover, the statutes set out above establish that the Attorney General, not any district attorney, has authority to choose and pursue the legal interests of the state as a whole. The legislature has provided that the Attorney General, not any or all of the district attorneys, is "the chief law officer for the state and all its departments," ORS 180.210, and that provision is not subject to limitation by ORS 180.070(4). Thus, although district attorneys may continue to be "law officers of the State," Article VII (Original), section 17—as they have identified themselves in the petition in this proceeding—they are no longer "*the* law officers of the State," Article VII (Original), section 17 (emphasis added). Their role as law officers is now subject to the Attorney General's superior authority as "the *chief* law officer for the state." ORS 180.210 (emphasis added). That fact, coupled with the legislature's direction that state officers, a category that indisputably includes the district attorneys, may not be represented by outside counsel, ORS 180.220(2), demonstrates the legislature's determination that the Attorney General, *and only the Attorney General*, speaks on behalf of the state with respect to matters concerning the state's legal interests.

Here, the original mandamus petition filed in the trial court states that "Plaintiffs-Relators listed in the caption above" "seek mandamus." The caption lists "DOUGLAS R. MARTEENY, District Attorney for Linn County, Oregon, and PATRICIA W. PERLOW, District Attorney for Lane County, Oregon, on behalf of all Oregonians." The petition alleges

"Petitioners are District Attorneys for the counties of Lane and Linn. These District Attorneys are law officers of the State and properly maintain this proceeding on behalf of

the public and on behalf of crime victims. Or Const, Art VII, § 17."

It is clear from the petition that Marteeny and Perlow are bringing this action in their official capacity, under a claim that they are empowered to represent "all Oregonians" and "the public" in this matter. They are not. Marteeny and Perlow lack the authority to bring this proceeding on behalf of the state. In this matter, Marteeny and Perlow are asserting authority to represent the interests of "all Oregonians" to contest an action by the Governor, and the Attorney General is asserting authority, on behalf of the State of Oregon, and all Oregonians, to defend that same action. The untenability of the situation is self-evident.

To summarize, Marteeny and Perlow cannot claim to represent the "public" or "all Oregonians" in this matter. In this case, Oregonians are represented by the State, and the State is represented by the Attorney General. To the extent Marteeny and Perlow are authorized to be present in this litigation, if at all, it is solely in an individual capacity. That brings us to the issue of standing.

B.  *Standing*

Having concluded that the district attorneys lack authority to bring this proceeding on behalf of all Oregonians, we turn to the more general question whether they, or the victim relators, have standing to bring this mandamus proceeding. As noted above, the circuit court reasoned that the district attorneys have standing because the district attorney "in the county of conviction retains an interest in preventing the judgment of conviction from being unlawfully diminished." In light of its determination that the district attorneys had standing, the court did not consider whether the victims did as well.

For federal courts, justiciability principles, like standing, are constitutional, grounded in the "cases and controversies" provision of Article III, section 2, of the United States Constitution. *Kellas v. Dept. of Corrections*, 341 Or 471, 478, 145 P3d 139 (2006). As a matter of Oregon constitutional law, "such justiciability doctrines as mootness and standing are not implicit in Article VII (Amended), section 1—

at least not in public action cases or those involving matters of public importance[.]" *Couey v. Atkins*, 357 Or 460, 521, 355 P3d 866 (2015). Consequently, standing, for Oregon law, is statutory in nature, and "the legislature can recognize the right of any citizen to initiate a judicial action to enforce matters of public interest." *Kellas*, 341 Or at 484.[10]

In *Couey*, in the course of evaluating the breadth of the constitutional judicial power, the Supreme Court observed that, in early mandamus cases, the court had "recognized the authority of courts to entertain public actions regardless of the standing of those who initiated them." 357 Or at 519 (citing *State v. Ware*, 13 Or 380, 10 P 885 (1886), and *State ex rel Durkheimer v. Grace*, 20 Or 154, 158, 25 P 382 (1890)).

Relators seem to argue that, because, under *Kellas* and *Couey*, there is no *constitutional* standing requirement, they necessarily have standing as members of the public to constrain the Governor's exercise of her clemency power. While they are correct about the breadth of the constitutional judicial power, *see Couey*, 357 Or at 521, their argument fails to address the statutory question of whether they are beneficially interested parties within the meaning of the mandamus statute.

ORS 34.105(4) defines "relator" for purposes of mandamus: "'Relator' means the beneficially interested party on whose relation a mandamus proceeding is brought." That subsection was enacted in 1989, when the legislature reorganized the mandamus statutes. Or Laws 1989, ch 702, § 2. The requirement that a relator be "beneficially interested," however, has been in the statute from the time of the Deady Code. General Laws of Oregon, Civ Code, ch VII, title II, § 584, p 226 (Deady 1845-1864) ("The writ shall be allowed by the court or judge thereof upon the petition *** of the party beneficially interested.").

For 50 years we have held that mandamus requires that a relator be "aggrieved [and have] a private interest

---

[10] In *Couey*, the court explained that actions involving "issues of public interest" include "at the least" "those challenging the lawfulness of an action, policy, or practice of a public body." 357 Or at 522.

in or claim[ ] the immediate benefit of the act sought to be coerced." *Parks v. Tillamook Co. Comm./Spliid*, 11 Or App 177, 211, 501 P2d 85 (1972). In *State ex rel. Young v. Keys*, 98 Or App 69, 72, 778 P2d 500 (1989), we held that, to be a beneficially interested party for purposes of mandamus, a relator "must [have] more than just an interest in common with the public generally." In *Young*, we explained that the Metropolitan Public Defenders (Metro) lacked a sufficient individualized interest to support standing to compel the Multnomah County District Court to stop using release agreements that include agreement that a criminal defendant can be tried *in absentia* if they fail to appear:

> "Metro's interest regarding the release agreement is only as appointed counsel for a defendant in a criminal action who is required to sign the agreement in order to be released. Metro and its associated attorneys are not parties to the criminal action, and pretrial release decisions of the district court do not effect [*sic*] them. A decision ordered by a writ in a criminal proceeding may be beneficial to the defendant who is a client of Metro, but it can have no benefit to Metro."

98 Or App at 72. We also rejected Metro's contention that it had standing because "representing a defendant in a criminal case who is tried *in absentia* may compromise the ethical responsibilities of the individual attorney employed by Metro." *Id.* We explained that potential ethical issues for attorneys were not sufficiently dependent on the court's practice of using the release agreements to give Metro a right "to seek enforcement of the duty that it claims that the district court has." *Id.* at 73.

Relators here have not argued that *Young* is inapplicable or somehow distinguishable. They have not asserted that that case is flawed, or even wrong, let alone "plainly wrong." *Accord Farmers Ins. Co. v. Mowry*, 350 Or 686, 697-98, 261 P3d 1 (2011) (addressing considerations pertaining to adherence to *stare decisis* with respect to statutory construction); *State v. Civil*, 283 Or App 395, 396, 388 P3d 1185 (2017).

Pursuant to *Young*, relators do not have standing in mandamus simply by virtue of a generalized interest,

indistinct from that possessed by the public at large, in gubernatorial clemency actions conforming to procedural requirements. *See Young*, 98 Or App at 72 (to be a beneficially interested party, a relator "must [have] more than just an interest in common with the public generally"). Additionally, while the commutations at issue here affect the victim families far more profoundly than the public generally, their grief and anger, as understandable as it is, does not confer legal standing, as the Oregon Supreme Court has made clear:

> "The fact that it was their son for whose murder Nunn has been sentenced to die does not alter the case, even though it be natural that they should feel more deeply upon the subject than other members of the general public. Punishment for crime is not a matter of private vengeance, but of public policy. Any violation of constitutional rights which might be supposed to flow from what is asserted to be an 'unconstitutional' exercise by the executive of the pardoning power would affect equally all the people of the state, rather than the plaintiffs in a different and special way."

*Eacret v. Holmes*, 215 Or 121, 124-25, 333 P2d 741 (1958).

Thus, if relators have standing, it is because they, as distinguished from the public in general, have a concrete interest in compelling the Governor to exercise her clemency power in a particular way and compelling BOPPS not to hold hearings pursuant to the Governor's clemency order. *See Kellas*, 341 Or at 477 ("[T]he statute that confers standing in the particular proceeding that the party has initiated" is critical to the standing inquiry, "because standing is not a matter of common law but is, instead, conferred by the legislature." (Internal quotation marks omitted.)). We begin by considering the individualized interests of the district attorneys.

Relators contend that the district attorneys have individualized interests in compelling the Governor to exercise her clemency power in a particular way and compelling BOPPS not to act outside its jurisdiction, because "[t]he full life cycle of a criminal case is within the scope of duties of the District Attorney, to include all proceedings up to and including clemency proceedings." And the trial court ruled

that district attorneys have standing because they "retain[] an interest in preventing the judgment of conviction from being unlawfully diminished."[11] Both positions are incorrect in that they fail to understand in whose name those criminal cases are brought, and in whose name those convictions are obtained: the State's.

When a district attorney obtains a conviction at trial, they do so in the name of the State of Oregon, not their own. The continued integrity of a conviction, obtained in the state's name, is the *state's* interest, not the interest of the individual district attorney. As an example, the state, through the Attorney General, on a regular basis concedes error on appeal—acknowledging that a conviction, or an aspect of a conviction, was erroneous. Although individual district attorneys may be consulted before the Attorney General makes that decision, they lack the power to countermand the decision of the Attorney General to prevent her from conceding an error. Accordingly, the detailed discussion, above, regarding the statutory authority of district attorneys versus the Attorney General resolves the basis for standing relied upon by the trial court—that district attorneys "retain[] an interest in preventing the judgment of conviction from being unlawfully diminished." They do not; the state retains that interest, and the Attorney General, as the chief law enforcement officer for the state, decides when and how to assert it. Marteeny and Perlow's disagreement with the Attorney General's decision to defend the commutations here does not confer on them standing to assert a position contrary to the Attorney General in mandamus.

Having rejected the basis for standing relied upon by the trial court, we need to determine if some other source of standing may apply. Again, standing in mandamus is statutory in nature. Relators have standing if they, as distinguished from the public in general, have a concrete

---

[11] We note that the circuit court did not articulate any ground on which to conclude that the district attorneys had standing to challenge hearings for the juvenile offenders—including intervenor, whose hearing had been scheduled but was canceled after the court issued the peremptory writ—who were convicted in counties other than Linn and Lane. Because, as explained below, we conclude that the district attorneys lack standing to challenge the hearings of any of the juvenile offenders, we need not separately address that problem.

enforceable interest. If relators are correct that the proce-
dural requirements in ORS 144.650 apply to every clemency
action, then that statute could provide the source of such an
interest as to their procedural argument, which arises in the
cross-appeal—at least as to the few juvenile offenders con-
victed in Lane and Linn Counties—because ORS 144.650(1)
provides for notice of a clemency application to "[t]he district
attorney of the county where the conviction occurred," and
ORS 144.650(3) provides for the district attorney, in turn,
to provide notice to victims. As such, to resolve the question
of relators' standing, we are drawn into a discussion of the
merits of their substantive argument.

## IV.   ORS 144.650

We now turn our attention to the merits portion of
relators' arguments. As set out at the beginning, relators
advance three categories of argument: procedural, delega-
tion, and jurisdiction. We begin with relators' procedural
arguments, which assert that (1) ORS 144.650, while not
substantively limiting the Governor's clemency power, sets
forth mandatory procedures that govern clemency applica-
tions; (2) a grant of clemency therefore *requires* an appli-
cation, either from the applicant to the Governor, or from
the Governor to herself, and (3) the Governor is obligated,
per ORS 144.650, to seek the input of district attorneys
and crime victims prior to a grant of clemency. The manda-
mus court correctly rejected relators' interpretation of ORS
144.650.

"A mandamus action is a special proceeding used to
compel a government official to perform a legal duty." *State
ex rel Dewberry v. Kulongoski*, 346 Or 260, 274, 210 P3d 884
(2009). "The legal right to compel the performance of the
legal duty 'must be plain and complete.' *Florey v. Coleman*,
114 Or 1, 2, 234 P 286 (1925)." *State ex rel Engweiler v.
Felton*, 350 Or 592, 628, 260 P3d 448 (2011). In other words,
"'no petitioner is entitled to the remedy of mandamus unless
he has a clear legal right to the performance of the partic-
ular duty sought to be enforced and unless there is a plain
legal duty on the part of the defendant to perform the act.'"
*Engweiler*, 350 Or at 628 (quoting *United States of America
v. Cohn*, 201 Or 680, 684, 272 P2d 982 (1954)); *see also* ORS

34.110 ("A writ of mandamus may be issued to any inferior court, corporation, board, officer or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust or station[.]").[12]

In this case, the acts that relators contend the Governor has a legal duty to perform derive from ORS 144.650.[13] That statute, set forth in full previously, 321 Or App at 254 n 2, governs procedure "[w]hen an application for a pardon, commutation or remission is made to the Governor." Relators contend that the first sentence of ORS 144.650, read in context, indicates a legislative intention to prohibit the Governor from exercising her power under Article V, section 14, to grant pardons, commutations, or remissions unless and until an application is filed. In their view, "the actual processing of *all clemency actions* except reprieves is specifically described in ORS 144.650." (Emphasis added.)

---

[12] With regard to the requirement that no "plain, speedy, and adequate remedy" is available, ORS 34.110, the Supreme Court has explained that "a 'plain' remedy is one that is obvious, clear, and without uncertainty." *Kulongoski*, 346 Or at 271. However, the court has not required the "act which the law specially enjoins, as a duty resulting from an office, trust or station," ORS 34.110, to be obvious or settled; rather, "mandamus can be used to decide a novel legal question." *State ex rel Kristof v. Fagan*, 369 Or 261, 285, 504 P3d 1163 (2022).

[13] We note that, regardless of whether the Governor and other defendants have plain legal duties to perform particular acts, relators could not be entitled to the precise remedy that they seek in the petition—a writ of mandamus directing the Governor, the DOC, the OYA, and BOPPS "to honor and follow all procedural and substantive provisions of Oregon law as to any proposed criminal sentence reduction or pardon, mandating that they report to this Court the manner in which they will comply with the law, and agreeing not to implement any sentence reduction, early release, or pardon (any pending or contemplated clemency order by the Governor) absent confirmation by this Court that it is satisfied that such clemency implementation is authorized by law and complies with the law."

"A writ of mandamus may be issued to any inferior court, corporation, board, officer or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust or station." ORS 34.110. Given that relators have not alleged—and could not allege—any duty of the Governor or any of the other defendants to report to any court the manner in which they will comply with procedures regarding the Governor's exercise of her clemency power, and they certainly could not allege the power of any court to require the Governor to confirm that the court is satisfied that the Governor's exercise of her clemency power is authorized by and complies with the law before she exercises that constitutional power, no peremptory writ issued in this proceeding could ever contain such requirements. *See Haugen*, 353 Or at 715 ("'[I]t is not within judicial competency to control, interfere with, or even to advise the Governor when exercising his power to grant reprieves, commutations, and pardons.'" (Quoting *Eacret*, 215 Or at 125-26.)).

They argue that that understanding of ORS
144.650(1) is supported by ORS 144.660, which clearly
addresses all acts of clemency by requiring a report to the
legislature that includes "each reprieve, commutation or
pardon granted." They point out that the items that must be
listed in the report for "each" act of clemency include items
listed in the various subsections of ORS 144.650. They also
rely on ORS 144.650(5), which was added to the statute in
1983, as demonstrating an understanding that each clem-
ency decision must begin with an application.

In their view, considered together, "the constitu-
tional provisions and the statutory provisions clearly antici-
pate that the commutation of sentence process is to be han-
dled on an individual basis and is to be based on an applica-
tion which serves as a vehicle to ensure orderly notifications,
gathering of information, and a thoughtful and informed
deliberation period." To hold otherwise, they contend, would
frustrate the legislative goal of requiring "the Governor to
be fully informed as to specific information about the crimes
committed and the statements of the District Attorneys,
and the victims, in every contemplated clemency action."

We disagree with relators' view of ORS 144.650.
Their argument suffers from a fundamental textual prob-
lem: ORS 144.650(1) states the circumstances in which it
applies: "When an application for a pardon, commutation or
remission is made to the Governor[.]" ORS 144.650(1). Ergo,
when an application for a pardon, commutation or remis-
sion is *not* made to the Governor, ORS 144.650, and the
procedural requirements that it establishes, simply do not
apply.

As set out in detail in our discussion of the history of
the clemency power, above, the clemency power has always
been a broad plenary power of the executive. The historical
forms of pardons have varied in their modes of initiation.
Typically, but not always, individual pardons began with
petitions or pleas to a sovereign. Mass pardons typically
were initiated without a prior petition or plea. But in neither
case was the practice uniform. What is clear from history is
that neither the framers of the United States Constitution,
nor the framers of the Oregon Constitution, understood the

pardon power in either constitutional document to be limited to only those cases in which a person had applied for a pardon. And we can find no evidence that the Oregon legislature has ever sought to constrain the broad constitutional power of Oregon governors to grant clemency by requiring that they act only when invited to do so through an application. The statutes upon which relators rely simply do not impose such a limitation.

Relators read ORS 144.650 as affording rights to district attorneys—rights to notice and by implication, participation, in the clemency process. Relators would invalidate any clemency action taken without that notice, and impliedly, without their participation. That construction of the statute necessarily creates a substantive limitation on the Governor's clemency power, and as such that interpretation has been rejected by the Oregon Supreme Court:

> "We find no statute presently in force which purports to regulate the power to grant reprieves, commutations and pardons vested in the governor by the constitution. Although it has been argued that ORS *** 143.040 [the predecessor of ORS 144.650[14]], by implication, restrict[s] or limit[s] this power of the governor, we do not agree. We believe that if the legislature should deem it advisable to regulate the constitutional pardoning power of the governor, it will do so in clear, direct language and not attempt such regulation by implication."

*Fredericks v. Gladden*, 209 Or 683, 689-90, 308 P2d 613, *modified on other grounds on reh'g*, 211 Or 312, 315 P2d 1010 (1957).

The court made the same points a year later, in a case in which the parents of a murder victim sought a declaration prohibiting the Governor from commuting the death sentence of the offender: "Article V, § 14 grants the

---

[14] As discussed further below, ORS 143.040 (1957) provided,

"At least 20 days before an application for a pardon, commutation or remission is made to the Governor, written notice of the intention to apply therefor, signed by the person applying, and stating briefly the grounds of the application, shall be served upon the district attorney of the county where the conviction was had and upon the Director of Parole and Probation. Proof by affidavit of the service shall be presented to the Governor."

[clemency] power 'subject to such regulations as may be provided by law.' Whatever may be the extent of the authority entrusted to the Legislature to regulate the Governor's pardoning power, there are no such regulations now in existence." *Eacret*, 215 Or at 126-27. In a footnote, the court addressed, and rejected, the possibility that various then-existing and prior provisions might be understood to limit the Governor's clemency power:

> "In 1864 the Legislature provided: 'When application is made to the governor for a pardon, before granting the same, he must require the judge of the court in which the conviction was had, or the district attorney by whom the action was prosecuted, to furnish him, without delay, with a statement of the facts proved on the trial, and of any other facts having reference to the propriety of granting or refusing the pardon; and this section also applies to an application for the remission of a fine or forfeiture.' Deady's Code, p 499, § 336. This section remained in effect until it was repealed by Oregon Laws, 1939, ch 266, § 15. *** ORS 143.010, which authorizes the Governor to grant reprieves, commutations and pardons 'Upon such conditions and with such restrictions and limitations as he may think proper,' was held in [*Ex Parte Houghton*, 49 Or 232, 234, 89 P 801 (1907)] to be 'but a restatement of the law as it exists without legislative action.'

> "ORS 143.040 provides: 'At least 20 days before an application for a pardon, commutation or remission is made to the Governor, written notice of the intention to apply therefor, signed by the person applying, and stating briefly the grounds of the application, shall be served upon the district attorney of the county where the conviction was had and upon the Director of Parole and Probation. Proof by affidavit of the service shall be presented to the Governor.' *This section does not purport to regulate the Governor's power. It merely prescribes a procedure to be followed by the applicant for 'a pardon, commutation or remission.'"*

*Id.* at 127 n 2 (emphasis added).

Contrary to relators' arguments, ORS 144.650 is properly understood, through its text, content, and history, as creating a statutory mechanism, not to benefit district attorneys, but largely to benefit *governors*. As explained

above, in 1864 the legislature enacted a provision stating, "When application is made to the governor for a pardon, before granting the same, he must require the judge of the court in which the conviction was had, or the district attorney by whom the action was prosecuted, to furnish him, without delay, with a statement of the facts proved on the trial, and of any other facts having reference to the propriety of granting or refusing the pardon; and this section also applies to an application for the remission of a fine or forfeiture.'" *Eacret*, 215 Or at 127 n 2 (quoting General Laws of Oregon, Crim Code, ch XXXII, title I, § 336, p 384). From the time of the Deady Code a companion provision stated, "If any district attorney shall willfully neglect, when required, to furnish the governor the statement of facts as provided in the last section, the governor may remove such attorney from office, and appoint some suitable person to fill the vacancy until the next general election." General Laws of Oregon, Crim Code, ch XXXII, title I, § 337, p 384. Those provisions gave the Governor tools to compel the gathering of information relevant to clemency decisions, even when some individuals with that information might not be inclined to cooperate.

The first provision noted above remained in effect until it was repealed in 1939. Oregon Laws 1939, ch 266, § 15. In the same bill, the legislature enacted the provision that is now ORS 144.650. Or Laws 1939, ch 266, § 14. It was part of a bill that created a new entity, the Board of Parole and Probation; it was not originally codified with the provisions relating to clemency. It provided, "At least 20 days before the application for a pardon, commutation or remission is made to the Governor, written notice of the intention to apply therefor, signed by the person applying, and stating briefly the grounds of the application, must be served upon the district attorney of the county where the conviction was had, and upon the director of parole and probation, and proof, by affidavit of the service must be presented to the Governor." Or Laws 1939, ch 266, § 14; OCLA 26-2314. As the court held in *Eacret*, that provision "does not purport to regulate the Governor's power. It merely prescribes a procedure to be followed by the applicant for 'a pardon, commutation or remission.'" 215 Or at 127 n 2.

Over the years, the legislature has further amended ORS 144.650 several times. In 1983, the legislature added ORS 144.650(5), which provides:

"Following receipt by the Governor of an application for pardon, commutation or remission, the Governor shall not grant the application for at least 30 days. Upon the expiration of 180 days, if the Governor has not granted the pardon, commutation or remission applied for, the application shall lapse. Any further proceedings for pardon, commutation or remission in the case shall be pursuant only to further application and notice."

Based on that subsection, relators contend that, at least by 1983, the legislature must have intended all clemency actions to begin with an application:

"The regulatory time constraints placed on the Governor to act on the application within 180 days or 'the application shall lapse' demonstrates that the application process set out in ORS 144.650 is the only path for a fully informed executive clemency action. If the application lapses, ORS 144.650(5) goes so far as to require '[a]ny further proceedings for pardon, commutation or remission in the case shall be pursuant only to further application and notice.' No other avenue for executive clemency is authorized."

Initially, we note that no appellate court has been called on to evaluate whether ORS 144.650(5) comports with the plenary clemency power granted to the Governor by Article V, section 14. We also note that, contrary to relators' argument, statutes need not *authorize* an avenue for executive clemency; all avenues opened by the constitutional grant of plenary clemency power to the Governor remain open without legislative action—and, indeed, remain open despite any legislative action that goes beyond "regulations" of their form. Art V, § 14. However, apart from the constitutional issues, regardless of whether, in 1983 or after, the legislature acted on the assumption that all clemency actions must begin with an application, it has never undertaken to correct the fundamental textual problem we identified above. That is, ORS 144.650 and the procedural requirements it creates applies only "[w]hen an application for a

pardon, commutation or remission" is made to the Governor. When the Governor exercises her constitutional pardon power of her own initiative, ORS 144.650 simply does not apply. As the Supreme Court observed in *Eacret*, 215 Or at 127 n 1, the predecessor of ORS 144.650(1) "does not purport to regulate the Governor's power. It merely prescribes a procedure to be followed by the applicant for 'a pardon, commutation or remission.'" The same is true of the current version.

The clemency statutes speak to issues concerning pardons that have been in existence for centuries. ORS 144.660, which requires a report to the legislature, evidences the same concern for notice that motivated the 1278 Statute of Gloucester, but it does not condition the Governor's power on that. The requirement for district attorneys to provide information in response to applications echoes the same concerns over accuracy in petitions that motivated the 1353 Parliamentary Commons, but it does not require clemency actions to come only in response to a petition. That the Oregon Legislative Assembly has enacted statutes that echo themes that have existed for centuries concerning pardons does not establish that the legislature sought to substantively curtail the clemency power. If the legislature intends to try to limit the way in which the head of a coequal branch of government may exercise her constitutionally granted powers, we believe it will do so expressly, not by implication. *Fredericks*, 209 Or at 690 ("We believe that if the legislature should deem it advisable to regulate the constitutional pardoning power of the governor, it will do so in clear, direct language and not attempt such regulation by implication.").

In sum, the circuit court did not err in rejecting relators' argument that, before commuting the sentences of the juvenile offenders, the Governor had a duty to follow the procedures required by ORS 144.650 for applications for clemency. Because the notice provisions of ORS 144.650(1) and (3) did not apply, neither the DA relators nor the victim relators had individualized interests in requiring the Governor to comply with the requirements of ORS 144.650 before taking the clemency actions at issue.

## V.  DELEGATION AND JURISDICTION

We now consider the other two parts of relators'
substantive argument—that the Governor's commutations
of the 73 juvenile offenders were unlawful in that they del-
egated the release decision to BOPPS, and that BOPPS
lacked jurisdiction to hold such hearings. Like relators'
assertion about ORS 144.650 providing an individual inter-
est sufficient for standing in mandamus, here too, if rela-
tors are correct on the merits of their delegation and juris-
diction arguments, there could, *arguably*, be a pathway to
standing for the DA or victim family relators as to those
issues, which are presented on appeal, through reliance on
Article I, section 43(4)(b), which provides that "[u]pon the
victim's request, the prosecuting attorney, in the attorney's
discretion, may assert and enforce a right established in
this section." In search of standing, we are therefore, again,
drawn into a discussion of the merits.

As previously set out, the circuit court held that
BOPPS had a duty not to "exercise authority purportedly
provided by executive commutation order to conduct any
release hearing or carry out any early release process" for
any of the juvenile offenders, because, although BOPPS is
authorized to conduct such hearings under ORS 144.397,
that statute's applicability provision indicates that it does
not apply to sentences imposed before January 1, 2020, or
to "persons who were originally sentenced before January 1,
2020." Or Laws 2019, ch 634, § 32, *amended by* Or Laws 2019,
ch 685, § 4, *compiled as a note after* ORS 144.397(2021).[15]

Administrative agencies are creatures of statute.
*City of Klamath Falls v. Environ. Quality Comm.*, 318 Or 532,
545, 870 P2d 825 (1994). The statute that provides BOPPS

---

[15] As relevant here, Oregon Laws 2019, chapter 634, section 32, *amended by*
Oregon Laws 2019, chapter 685, section 4, provides, as follows:

"(1) [Section] 25 [(the section that was codified as ORS 144.397)] ***
appl[ies] to sentences imposed on or after January 1, 2020.

"(2) Notwithstanding subsection (1) of this section, section[] *** 25,
chapter 634, Oregon Laws 2019, *** do[es] not apply to persons who were
originally sentenced before January 1, 2020, and who are subsequently
resentenced on or after January 1, 2020, as the result of an appellate decision
or a post-conviction relief proceeding or for any other reason."

with power to hold early release hearings for juvenile offenders is ORS 144.397, which directs BOPPS as follows:

"(1)(a)   A person convicted of an offense or offenses committed when the person was under 18 years of age, who is serving a sentence of imprisonment for the offense or offenses, is eligible for release on parole or post-prison supervision as provided in this section after the person has served 15 years of imprisonment.

"* * * * *

"(3)   When a person eligible for release on parole or post-prison supervision as described in subsection (1) of this section has served 15 years of imprisonment, the State Board of Parole and Post-Prison Supervision shall hold a hearing. The hearing must provide the person a meaningful opportunity to be released on parole or post-prison supervision."

The remaining subsections of that statute provide further detail: Subsection 4 provides that, before the hearing, BOPPS may require the person to be examined by a psychiatrist or psychologist; subsection 5 provides circumstances that BOPPS must consider in making its decision; subsection 6 provides that BOPPS may not consider the person's age to be an aggravating factor; subsections 7 through 12 provide for procedure and results, including release[16]; and subsection 13 provides that BOPPS "may adopt rules to carry out the provisions of this section."

       Those statutory subsections indisputably give BOPPS authority to hold hearings of the type contemplated

---

[16] Subsection 7 provides, as follows:

"(7) If the board finds that, based on the consideration of the age and immaturity of the person at the time of the offense and the person's behavior thereafter, the person has demonstrated maturity and rehabilitation, the board shall release the person as follows:

"(a) For a person sentenced under ORS 163.105, 163.107, 163.115 or 163.155, the board shall set a release date that is not more than 60 days from the date of the hearing and, notwithstanding section 28, chapter 790, Oregon Laws 1989, the person shall be released on parole in accordance with ORS 144.125, 144.260 and 144.270.

"(b) A person sentenced to a term of imprisonment under a provision of law other than ORS 163.105, 163.107, 163.115 or 163.155 shall be released on post-prison supervision in accordance with ORS 144.096 and 144.098 within 60 days of the date of the hearing."

by the commutation order. However, the circuit court concluded that BOPPS lacks power to hold hearings for the commuted juvenile offenders in particular, because the applicability provision of SB 1008, as amended, not only make the juvenile offenders ineligible for a hearing under that statute, but also limit BOPPS's jurisdiction to hold those hearings to persons originally sentenced on or after January 1, 2020. In essence, the trial court appears to have believed that the Governor could not impose a sentence, via commutation, that was not authorized by statute. That is incorrect.

A commutation is "a change of punishment to which a person has been condemned to one less severe." *Fehl v. Martin*, 155 Or 455, 459, 64 P2d 631 (1937). It is "[t]he executive's substitution in a particular case of a less severe punishment for a more severe one that has already been judicially imposed on the defendant." *Black's Law Dictionary* 318 (9th ed 2009); *see also, e.g.*, *Lee v. Murphy*, 63 Va (22 Gratt) 789, 798 (1872) ("A commutation is the substitution of a less for a greater punishment.").

For some offenses, the legislature or the voters have provided mandatory minimum limits on what sentences may be imposed as a matter of statute. However, those limits do not constrain the Governor's power to commute sentences for those offenses, because the substance of the clemency power is not constrained by legislative sentencing statutes. The power to commute sentences includes the power to impose "conditions which do not in themselves offend the Constitution, but which are not specifically provided for by statute." *Schick v. Reed*, 419 US 256, 264, 95 S Ct 379, 384, 42 L Ed 2d 430 (1974).

Although a commutation may not officially resentence an offender, the commuted sentence "stands as though it had originally been for the commuted term," and entitles the offender to benefits of the commuted term—for example, good time. *Ferguson v. Cupp*, 23 Or App 122, 124-25, 541 P2d 489 (1975) ("To the 'life' sentence originally imposed the 'executive has superimposed its mind upon the judgment of the court; but the sentence remains, nevertheless, the judgment of the court' and stands as though it had originally

been for the commuted term[.]" (Quoting 24 Op Atty Gen 71 (1948) (quoting *Duehay v. Thompson*, 223 F 305, 307 (9th Cir 1915)).).

It appears to be universally understood that the commuted sentence need not be a sentence that was previously legislatively created. *See, e.g.*, *Baston v. Robbins*, 153 Me 128, 130, 135 A2d 279, 281 (1957) ("[A]uthority of the Governor and Council is derived from the Constitution and it may commute the sentence with such restrictions as may be deemed proper. If the restrictions and limitations imposed are in conflict with the provisions of any statute, then such statute does not control."); *Green v. Gordon*, 39 Cal 2d 230, 232-33, 246 P2d 38, 39, *cert den*, 344 US 886 (1952) ("The penalties prescribed by statute * * * are the ones to be imposed by the trial court upon conviction of murder, and the statutory provisions relating to such penalties and the right to parole do not purport to limit the governor's power to impose conditions upon a commutation of sentence."); *Schick v. Reed*, 483 F2d 1266, 1268 (DC Cir 1973), *aff'd*, 419 US 256, 95 S Ct 379, 42 L Ed 2d 430 (1974) (holding same); *Carroll v. Raney*, 953 SW2d 657, 660 (Tenn 1997) ("[T]he Governor had the constitutional authority * * *to grant a commuted sentence of '22 years to life,' even if the applicable statutes precluded the imposition of an indeterminate sentence for the offense of rape.").

Oregon's governors have commuted death sentences to life with the possibility of parole, *see* 32 Op Atty Gen 91 (1964), and sentences of life without the possibility of parole to terms of 25 years, subject to release on parole, *see* 24 Op Atty Gen 71 (1948). That practice reflects a recognition that commutation may move a person who is outside the power of BOPPS and its predecessors by virtue of the initial sentence imposed into that agency's jurisdiction, allowing the agency to hold a hearing and, ultimately, release the person. *See also Tuel v. Gladden*, 234 Or 1, 3, 379 P2d 553 (1963) (noting that, in 1954, the Governor had commuted the defendant's "sentence to 40 years and thereby made him eligible for parole," and that he had subsequently been released).

Consider offenses subject to Ballot Measure 11 (1994). A defendant convicted of a Measure 11 offense may

not lawfully be sentenced to a punishment less severe than the mandatory minimum period of incarceration, as a matter of statutory law. *See, e.g.*, *State v. Ferman-Velasco*, 333 Or 422, 427, 41 P3d 404 (2002) ("Unlike the sentencing guidelines, which set out a multi-factor methodology for determining sentences, Measure 11 sets mandatory minimum sentences for certain felony offenses."). But that legislative action does not prevent the Governor from commuting a Measure 11 sentence to some less severe punishment. The less severe punishment is, necessarily, one that could not have been imposed on that person for that offense as a matter of statutory law.

Accordingly, in commuting sentences, the Governor is not constrained to choosing between statutorily authorized sentences; she may choose to commute any sentence by replacing a statutorily lawful sentence with the less-severe punishment of her choice, regardless of whether it is available as a sentence for that person for that offense as a matter of statute. As one court noted, commutation "removes a judicially imposed sentence and replaces it with a lesser, executively imposed sentence." *Illinois v. Rissley*, 206 Ill 2d 403, 463, 795 NE 2d 174, 207 (2003).

The executively imposed sentence stands on equal footing to the legislatively imposed sentence. To hold otherwise fails to recognize that commutation is not "a 'private act of grace from an individual happening to possess power[.]' Rather, it is 'part of the Constitutional scheme' and permits the chief executive to determine that 'the public welfare will be better served' by clemency." *Haugen*, 353 Or at 742 (quoting *Biddle v. Perovich*, 274 US 480, 486, 47 S Ct 664, 71 L Ed 1161 (1927)).

Here, the effect of the Governor's commutation is to impose a sentence where the juvenile offenders whose sentences were commuted are now in the group of people "eligible for release on parole or post-prison supervision as described in subsection (1) of this section." ORS 144.397(3). Given that, once each of the juvenile offenders "has served 15 years of imprisonment, the State Board of Parole and Post-Prison Supervision shall hold a hearing." *Id.* The Governor's commutations have made the juvenile offenders eligible for

the hearing, and, because the juvenile offenders are "eligible for release on parole or post-prison supervision as described in subsection (1) of this section," BOPPS has jurisdiction to hold hearings for them; in fact, the duty to hold such hearings is mandatory.

That brings us to the third part of relators' argument: their contention, as an alternative to the circuit court's reasoning, that the commutation order improperly delegates the Governor's commutation power to BOPPS. They appear to be of the view that the Governor's commutation of the juvenile offenders' sentences will not be complete until BOPPS holds the hearings and decides whether each youth offender will be released. They contend that that amounts to an unlawful delegation because it means that BOPPS, rather than the Governor, decides whether to award clemency or not, and it means that the clemency decision for some of the juvenile offenders will not be made until years after the Governor leaves office.

As we have explained, when the Governor commutes a sentence, she, in her discretion, chooses what lesser punishment to impose. It would be within her power to decide to release the juvenile offenders immediately, if she chose that lesser punishment. However, here, she decided that the appropriate punishment was to commute the juvenile offenders' sentences to sentences that include *the right to* a hearing after 15 years of imprisonment. She did not purport to leave to BOPPS whether to commute the juvenile offenders' sentences; she completed the commutation by providing the juvenile offenders with a new, less severe punishment: continued imprisonment, but with the right to a hearing. Relators provide no explanation and cite no authority for the proposition that she could not impose that particular lesser punishment—a continuing sentence of imprisonment, but with the right to a hearing—and we perceive none. Accordingly, we reject relators' alternative argument.

## VI.   CONCLUSION

"[P]ardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." *Ohio*

*Adult Parole Auth. v. Woodard*, 523 US 272, 276, 118 S Ct 1244, 140 L Ed 2d 387 (1998) (reaffirming *Connecticut Bd. of Pardons v. Dumschat*, 452 US 458, 464, 101 S Ct 2460, 2464, 69 L Ed 2d 158 (1981)). The plenary power of the executive to pardon emphasizes the extraordinary nature of what relators seek here. And while mandamus is an "extraordinary remedy," it is narrowly proscribed—to be awarded on "equitable principles" and "never issue unless the duty sought to be enforced is one legally defined." *State ex rel Ricco v. Biggs*, 198 Or 413, 425, 255 P2d 1055 (1953) *overruled by State ex rel Maizels v. Juba*, 254 Or 323, 460 P2d 850 (1969); *Emerson v. Deschutes Cty Bd of Comm'rs*, 46 Or App 247, 249, 610 P2d 1259, 1260 (1980).

As we mentioned at the beginning, relators in this matter feel that they have been denied justice. But hurt—no matter how sympathetic—does not translate to authority to challenge and displace commutations that accord with the constitutional powers afforded the Governor under Article V, section 14, of the Oregon Constitution. That constitutional power is plenary—historically indistinguishable from the powers of clemency of the President under the United States Constitution, and the powers of the monarch at English common law.

Mandamus is an extraordinary remedy to force compliance with a clear lawful duty; "[t]he legal right to compel the performance of the legal duty 'must be plain and complete.'" *Engweiler*, 350 Or at 628 (quoting *Florey*, 114 Or at 2). Relators' claim to procedural rights under ORS 144.650 is inapplicable because the commutations at issue here did not begin with a petition or application, but with the *sua sponte* prerogative of the Governor herself, and ORS 144.650 does not substantively deprive her of that authority.

Nor was there anything unlawful in the nature of the commutations at issue. Relators' fundamental complaint is that the legislature decided that ORS 144.397 should not apply to sentences imposed before January 1, 2020. That is true. But the Governor's clemency power is not limited to legislatively approved sentences. The legislature's policy choice regarding retroactivity does not constrain the Governor's policy choice as to the appropriate sentences for the juvenile

offenders. As we have explained, the clemency power is designed and, for more than 800 years, has been used, to do precisely what occurred here—replace a judicially imposed, or legislatively mandated, sentence with an executively created sentence under the Governor's determination that, in doing so, "the public welfare will be better served by inflicting less than what the judgment fixed." *Haugen*, 353 Or at 736-37 (quoting *Biddle*, 274 US at 486).

"[N]o official can invoke either 'policy' or 'politics' to avoid review of actions not authorized by law[.]" *Lipscomb v. State Bd. of Higher Ed.*, 305 Or 472, 477 n 4, 753 P2d 939 (1988). But here, the Governor's grants of clemency were lawful. As such, it is "not within judicial competency to control, interfere with, or even to advise the Governor when exercising his power to grant reprieves, commutations, and pardons." *Eacret*, 215 Or at 125-26. Ultimately, it is the voters, not the courts, who hold the power to limit gubernatorial clemency actions. *Haugen*, 353 Or at 742.

The grants of clemency at issue in this case were a lawful exercise of the Governor's power under Article V, section 14. Relators lack standing to challenge those grants of clemency, and, having addressed and rejected their merits arguments in determining standing, we have concluded that mandamus would not lie even if standing were present. Accordingly, the trial court erred in granting mandamus.

Reversed on appeal; affirmed on cross-appeal.